**Gayla McKEE, Plaintiff–Appellee,**

**v.**

**CITY OF ROCKWALL, TEXAS, et al.,
Defendants–Appellants.**

**No. 87–1879.**

United States Court of Appeals,
Fifth Circuit.

July 19, 1989.

James Ludlum, Jr., Ludlum & Ludlum, Austin, Tex., for defendants-appellants.

Steven B. Thorpe, Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, REAVLEY and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Gayla McKee sued the City of Rockwall and certain individual police officers from the Rockwall Police Department. She alleged that she had been injured as a result of the officers' refusal to make an arrest, and that this non-arrest was the result of a Rockwall policy that discriminated on the basis of gender. She sought damages pursuant to 42 U.S.C. § 1983, contending that her rights under the Equal Protection Clause had been violated.

The individual officers and the City sought summary judgment. The district court denied their motion. The officers and the City have asked for interlocutory review of that denial. Because we find that McKee has presented no evidence at all that the City pursues a discriminatory policy, we reverse the district court's judgment with respect to the individual officers. We have, however, no jurisdiction to hear an interlocutory appeal by the City, and so remand for further proceedings on the claim against the City.

## I

### A.  The Cause of Action

In April of 1986, Gayla McKee summoned police officers to the apartment she shared with Harry Streetman, claiming that Streetman had assaulted her. The police officers made no arrests, but did drive McKee to another location out of Streetman's view. After the officers had left, Streetman found McKee and slashed her in the leg with a knife. McKee contends that the officers acted pursuant to a discriminatory policy against making arrests in domestic assault cases. She further contends that the policy violates the Equal Protection Clause, and seeks damages from the officers and the City.

In reviewing the district court's disposition of a summary judgment motion, we consider the issues de novo. All reasonable doubts and inferences must be resolved in the light most favorable to the non-movant. *Thornbrough v. Columbus and Greenville Railroad Co.,* 760 F.2d 633, 640 (5th Cir.1985). We therefore summarize the facts as set out by McKee in her complaint and in the affidavit accompanying her summary judgment brief.

McKee says that she was living with Harry Streetman, her boyfriend, during April of 1986. When she arrived home one evening, Streetman attacked and beat her. She found that Streetman had disabled her car to prevent her from escaping. She went to a convenience store, and phoned the police.

Officers John Parrish and Gary Fleetwood were dispatched in response to the call. They eventually found McKee at the apartment. McKee says that while Parrish and Fleetwood were at the scene, they met Officer Trey Chaney, who was off-duty.

McKee told the officers that Streetman had assaulted her; that Streetman threatened to cause her severe injuries, and to kill her; that she was in fear of serious injury; and that Streetman would not permit her to retrieve her belongings, which were in the apartment.

McKee requested that the police arrest Streetman, or take her to her parents' home. She says that the officers refused to take either course. According to McKee, the officers said that she exaggerated the threats posed to her. They suggested she talk matters out with him.

McKee requested that the officers take her to the police station so that she could file a complaint against Streetman. She says that either Parrish or Fleetwood told her that they could not take her to the station because she was inappropriately dressed. She adds that the officers said that although they would not take her to the station, she was free to go there on her own and to file a complaint. She further alleges that the officers told her that after she had calmed down she probably would not want to file a complaint.

According to McKee, Streetman at this point threatened to burn her belongings if she went to the station. McKee says that the police did not respond in any way when Streetman made the threat.

She says that, after refusing to arrest Streetman or to take her to the police station or her parents' home, the police drove her to the apartment of Bruce Streetman, which was about fifty yards distant from the apartment Harry Streetman and McKee had been sharing. McKee phoned her parents, but Harry Streetman arrived at Bruce's apartment a few minutes after McKee, and interrupted her phone call. McKee went to her car to wait for her parents. Harry Streetman followed her, and cut her right leg with a knife.

The officers' account is in some respects inconsistent with McKee's. The officers say, for example, that they offered to take McKee to the police station, but that she refused to go, and, indeed, refused to give them the cooperation necessary to obtain a warrant for Streetman's arrest. Officer Parrish says that Streetman never threatened McKee in his presence. As we have already noted, however, we must on this review resolve factual conflicts in favor of the non-movant, and so we accept, for purpose of this opinion, McKee's version of these contested facts.

The officers' affidavits do, however, allege other facts which are uncontested by any of McKee's evidence, and which may be true even if we accept as true everything stated in McKee's own affidavit. The officers report that they were not able to detect any evidence that McKee had been assaulted. The officers could not detect "any welt, bruise, abrasion, cut, skin discoloration, unneat appearance, or any other indication that she had been beaten or assaulted." Moreover, although the officers had been told when summoned that McKee was trapped inside an apartment, she arrived on the scene from a convenience store where she had called the police. The officers report that McKee looked angry rather than hurt, and that Streetman was calm. The officers say that they stood by while McKee removed her purse and some belongings from Streetman's apartment. They attest that Fleetwood remained with Streetman while Parr-ish drove McKee to an address where McKee said she wanted to be taken; that the address was out of the sight of Streetman and Fleetwood; and that the address to which McKee was being taken was never mentioned within the hearing of Streetman.

McKee contends that the police officers would have arrested Harry Streetman but for a city policy which discouraged officers from making arrests in domestic violence cases. In an effort to present evidence of such a policy, McKee relied on an affidavit from her mother, and on statistics compiled from Rockwall's answers to McKee's interrogatories. Because these materials are crucial to the disposition of this case, we quote them in full, as presented to the district court. Darlene McKee's affidavit consists essentially of the following paragraph:

> Within one or two days of the assault upon my daughter, my husband Roy McKee and I had a conversation with Chief Beaty of the Rockwall Police Department. During that conversation we asked the Chief why Harry Streetman had not been arrested when our daughter first called the police and reported his assault upon her. The Chief responded that his officers did not like to make arrests in domestic assault cases since the women involved either wouldn't file charges or would drop them prior to trial.

The statistics were presented as follows:

Analysis of Arrests in Assault
Cases and For Domestic Violence
1982 and 1986

*Source*: Defendants' Answers to Interrogatories, No. 8

|  | 1982 | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|---|
| Cleared assaults | 15 | 14 | 24 | ? | 46 | 99 |
| Resulting arrests | 6 | 5 | 5 | 6 | 14 | 36 |
| Percentage of assaults leading to arrest |  |  |  |  |  | 36% |

|  | 1982 | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|---|
| Domestic violence calls | 10 | 5 | 10 | 9 | 18 | 52 |
| Resulting arrests | 3 | 2 | 3 | 1 | 2 | 11 |
| Percentage of domestic violence calls leading to arrests |  |  |  |  |  | 21% |

These statistics contain a glaring mathematical error—the totals for the "cleared assault" table add six arrests from 1985 without making any corresponding addition to the number of calls, and so distort the overall percentage—but, for the most part, we postpone comment on these statistics until Section V below.

The officers and the department both deny that the department ever had, and that the officers ever acted pursuant to, a policy of refusing to intervene in domestic violence cases. Chief Beaty denied that there had been any persistent failure or refusal of officers to make arrests in domestic violence cases where there existed probable cause to make an arrest.

## B. Procedural History

McKee sued the City of Rockwall and Officers Chaney and Fleetwood, alleging liability pursuant to 42 U.S.C. § 1983. The original complaint also named Eddie Keesee as a defendant, and made no claim against Officer Parrish. The claim against Keesee was later dropped.[1] McKee sought to invoke the state's pendent jurisdiction over any state law tort claims, but has not alleged any particular such claim.

The City and the officers sought summary judgment, contending that the officers were insulated from liability by the doctrine of qualified immunity; that McKee's complaint failed to state a claim against the City; that McKee had failed to present evidence showing that any of the officers or the City had violated any state or federal law; that McKee had failed to present any evidence that the City maintained a sexually discriminatory policy or custom which discouraged officers from making arrests for assaults arising in connection with domestic violence; that there was no causal link between the alleged policy and the non-arrest in this case; that McKee was the proximate cause of her own harm;

and that because McKee's federal allegations were defective, the court had no jurisdiction to hear any pendent state claims.

## II

■ We have jurisdiction to hear an interlocutory appeal from a district court's decision denying a motion for summary judgment by an individual officer defendant in a § 1983 suit. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed. 2d 411 (1985).

No such doctrine exists, however, for the benefit of municipal defendants. Rockwall concedes as much, but asks that we extend the doctrine of *Mitchell v. Forsyth* to encompass interlocutory appeals by municipalities in instances when individual officer defendants take interlocutory appeals and when some of the defenses asserted by the individual officers would, if accepted, protect the City from liability as well. Rockwall contends that permitting this limited range of interlocutory appeals would conserve judicial resources and protect cities from the expense of frivolous litigation.

We are not free, however, to shape the boundaries of our jurisdiction through a general equitable balancing of policy factors. The *Forsyth* Court itself applied the more general rule of *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978), and *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). *Forsyth*, 105 S.Ct. at 2816; *see also id.* at 2821 (concurring opinion of O'Connor, J., joined by Burger, C.J.). Under the doctrine of *Coopers* and *Cohen*, an interlocutory appeal is permissible only with respect to a decision which conclusively determines a disputed question, and which involves a claim "of right separable from, and collateral to, rights asserted in the action." *Forsyth*, 105 S.Ct. at 2816.

---

**1.** McKee appended to her brief a document captioned "Plaintiff's First Amended Original Complaint," which she purports to have filed with the district court. The amended complaint names Parrish as an additional defendant. The document in McKee's appendix is not file-stamped, and we express no opinion as to whether the document has been properly filed, or as to whether Officer Parrish has in fact been made a party to the underlying suit. Parrish has made no motion to become a party to this appeal.

The Court reasoned that when an individual officer defendant sought summary judgment on grounds predicated in part upon the qualified immunity doctrine, the denial of that motion addressed a collateral issue by disposing of the officer's right to be free from suit. *Id.* Municipalities cannot make any comparable argument establishing that denial of their summary judgment motions settles a collateral issue.

Nor are we inclined to find here so strange an animal as "pendent party interlocutory appellate jurisdiction." This Court, through an opinion by Judge Godbold, has recognized that pendent interlocutory appellate jurisdiction over additional issues is looked upon with disfavor, and must not be invoked merely out of "convenience to the litigants, or even to this court." *Garner v. Wolfinbarger*, 433 F.2d 117, 120 (5th Cir.1970). The same observation applies with at least equal force when we are asked to take pendent jurisdiction over parties otherwise not properly before us.

Precluding cities from taking an interlocutory appeal along with individual defendants may indeed result in some inefficient litigation. We expect, however, that the municipality will usually be able to reap in district court the benefits of a successful appeal by the city's individual co-defendants. In any event, we cannot expand our appellate jurisdiction without some signal from the Supreme Court that it is willing to relax the requirements of *Coopers* and *Cohen.*

The attempted appeal by the City of Rockwall in this case must therefore be dismissed for want of appellate jurisdiction.

### III

After the district court issued its opinion in this case, but prior to oral argument of the appeal, the Supreme Court handed down its decision in *DeShaney v. Winnebago County DSS,* —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Court held that "a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause." 109 S.Ct. at 1004.

Footnote three of the Court's opinion qualifies this holding by observing that "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)." *DeShaney,* 109 S.Ct. at 1004 n. 3.

Because McKee's complaint sounds in Equal Protection, rather than Due Process, it is not directly barred by the holding in *DeShaney. DeShaney* is nonetheless relevant to our analysis of this case. The Court's opinion in *DeShaney* endorses the general principle that choices about the "extent of governmental obligation" to protect private parties from one another have been left "to the democratic political processes." 109 S.Ct. at 1003. There is no constitutional violation when the "most that can be said of ... state functionaries ... is that they stood by and did nothing when suspicious circumstances dictated a more active role." 109 S.Ct. at 1007. Footnote three does not permit plaintiffs to circumvent the rule of *DeShaney* by converting every Due Process claim into an Equal Protection claim via an allegation that state officers exercised their discretion to act in one incident but not in another.

### IV

We begin with some observations that are obvious, but not any less important for their obviousness. The officers had no authority to make any arrests absent probable cause to do so. The existence of probable cause turns not so much upon whether Streetman had committed a crime as upon whether or not the officers had sufficient evidence that Streetman had committed a crime. If Streetman had in fact, as McKee claims, assaulted McKee, but the officers had at the time found no credible evidence of the assault, the officers could not have made any arrest. The later discovery of evidence tending to prove that an assault had occurred would not alter the fact that probable cause was missing at the time the officers decided not to arrest Streetman.

*DeShaney,* of course, goes well beyond these observations. The observations just summarized show only that, under certain conditions, the Rockwall officers *could not* have arrested Streetman. *DeShaney* goes on to say that even if the officers *could have* arrested Streetman, they were not under any constitutional obligation to do so. The *DeShaney* rule leaves officers and law enforcement agencies with some discretionary authority: they need not fear that, in any close case, they must choose between liability for a potential false arrest and liability for a potentially actionable non-arrest.

Nonetheless, even without *DeShaney*'s protection for officer discretion, these fundamental limitations upon the officer's authority to arrest Streetman come close to deciding this case. McKee alleges that Streetman violated Tex.Pen.Code § 22.01 (Vernon), dealing with assault, or Tex.Pen. Code § 22.02 (Vernon), dealing with aggravated assault. She contends that the officers should have arrested him pursuant to their authority under Tex.Code Crim.Proc. § 14.03(a) (Vernon), which permits officers to make a warrantless arrest based upon a reasonable suspicion that the arrestee has committed a felony.

■ It is arguable that, even accepting McKee's version of the facts, the officers in this case might reasonably have concluded that they lacked probable cause to believe that Streetman had committed an assault. The existence of probable cause to arrest turns upon the totality of the circumstances. The only evidence of the alleged assault was McKee's allegation. Yet the officers could see no physical indicia of an assault. The situation at the scene was, moreover, inconsistent with the details of the call relayed to the officers. McKee was not trapped within Streetman's apartment, but was outside the apartment, returning from the convenience store from which she phoned the police. McKee was hostile while Streetman was calm. It is not clear that the police would, under these circumstances, have developed the reasonable suspicion necessary to justify an arrest. If indeed the police could reasonably have believed that they lacked grounds to make an arrest, their refusal to do so cannot be unconstitutional. *See City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (if plaintiff has suffered no deprivation of constitutional rights, it is irrelevant that city's policy would have authorized such a deprivation).

We might be able to decide the case on this ground were it not for McKee's allegation that Streetman threatened her in the presence of the officers. McKee's allegation creates a fact issue as to whether the threat occurred, and as to whether the police officers heard the threat. Although a threat to McKee's property may not be evidence of a prior assault, it would itself be a crime. Texas law prohibits, under the name of "retaliation," threats against the property of a police informant. "Informant" is defined broadly, so as to encompass anyone who provides information to the government. Tex.Pen.Code § 36.06 (Vernon). If the officers heard the threat, they would have witnessed a felony, and would have had authority to arrest Streetman pursuant to Tex.Code Crim.Proc. § 14.01.

V

McKee cannot, however, prevail merely by showing that the officers knew facts that would have justified an arrest of Streetman. This is the lesson of *DeShaney:* that law enforcement officers have authority to act does not imply that they have any constitutional duty to act. McKee can sustain her claim only by showing that the non-arrest was the result of discrimination against a protected class. McKee purports to find such discrimination in an alleged policy of the Rockwall Police Department discouraging arrests in domestic violence cases. McKee contends that this policy discriminates against women.

McKee must present some evidence of such a policy in order to survive the defendants' summary judgment motion. When the nonmovant fails to make a sufficient showing on an essential element of her case, the moving party is entitled to sum-

mary judgment "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

We have already quoted in full the only evidence which McKee produced to support her allegation of a discriminatory policy. This evidence, however, is completely without probative weight. Half of the evidence consists of one statement, allegedly made by the Rockwall police chief, indicating that officers "do not like to make arrests" in domestic violence cases. A dislike is not a policy. Officers may do things —indeed, they may be required by policy to do things—that they do not like to do. Nor, for that matter, is one officer's dislike binding upon another. It is possible that most, or even nearly all, of the officers in the Rockwall Police Department disliked making arrests in domestic violence cases, but that Officers Fleetwood and Parrish did not share this dislike. In this respect, too, a dislike is different from a policy, which is binding on all officers regardless of their sentiments.

The remainder of the evidence consists of the rough statistical comparison between the "domestic violence" and "cleared assault" rates. We have already observed that McKee exaggerated the discrepancy between these two rates by figuring the numbers for 1985 into the numerator, but not the denominator, of the cleared assault fraction. There are additional problems. First, McKee's own evidence shows that the domestic violence arrest rate was *higher* than the cleared assault arrest rate in two of the four years for which McKee presented complete statistics. The domestic violence arrest rate was higher in 1983 and 1984 (40% and 30% compared to 36% and 21%, respectively), while the cleared assault arrest rate was higher in 1982 and 1986. As such the statistics do not, even on their face, permit one to infer a disinclination to make arrests in domestic violence cases, much less to infer a policy discouraging such arrests. Second, the statistics do not correct for the wide variety of factors

which might influence the likelihood that police would make an arrest: whether the assault was in progress when police arrived; whether a gun or knife had been used; whether the victim had suffered obvious physical injuries and required medical attention; and whether the victim refused to press charges when the police arrived. Third, the statistics do nothing to suggest gender-based discrimination. The statistics do not indicate how many of the victims in the cleared assault cases were women, or how many of the victims in the domestic violence cases were men.

There is still another reason why McKee's statistics, and the alleged statement of Chief Beaty, lack any probative value. McKee, according to her own affidavit, asked the officers to arrest Streetman *or* to take her to her parents' home. Even if one were willing to draw from Chief Beaty's alleged statement the unreasonable inference that Rockwall had a policy discouraging arrests in domestic violence cases, there is no reason that such a policy would have deterred the officers from taking McKee to her parents' home. Certainly a dislike for making arrests would not have prevented them from providing such transportation. The same is true if one is willing to draw from McKee's statistics the unreasonable inference that Rockwall had a policy discouraging arrests in domestic violence cases. Indeed, on McKee's argument, had the Rockwall officers done precisely what McKee asked by driving her to her parents' residence, their action would have entered McKee's statistics as a domestic violence "non-arrest" and so supported an inference that the police department discriminates against women. We find that reasoning absurd.

McKee cannot meet her burden under *Celotex* by using the statistics, or the statement attributed by her mother to Chief Beaty. With these bases for her case eliminated, her argument reduces to an attempt to generalize a single incident—the police department's inaction in her own case—into a general policy or practice. We have indicated in other contexts that a single incident, when unaccompanied by supporting history, will frequently be an inadequate

basis for inferring a policy. *See· e.g., Rodriguez v. Avita*, 871 F.2d 552 (5th Cir.1989) (applying *City of Canton v. Harris*, — U.S. ——, 109 S.Ct. 1197, 1205 & n. 10, 103 L.Ed.2d 412 (1989), to claim predicated on a single incident). To permit such an argument in this case would eviscerate the discretion reserved to police officers by *DeShaney*. Absent any evidence of a discriminatory policy, the only reasonable construction of the officers' action in this case is that they decided that McKee's complaint did not warrant any further response than what they gave. As *DeShaney* makes clear, this judgment is not actionable.

The § 1983 claims against the individual officers must be dismissed because McKee has failed to provide any evidence tending to show that the officers' inaction was a consequence of discrimination against a protected minority. With these claims eliminated, the jurisdictional basis for the pendent state law claims disappears, and they too must be dismissed.

## VI

Because we find that there is a "complete failure" of proof with respect to McKee's allegation of differential treatment of the victims of domestic violence, we do not decide whether other elements of an equal protection claim were present. In particular, we do not decide whether, had McKee created a fact issue as to the existence of a policy discriminating against victims of domestic violence, that policy would constitute intentional discrimination against women under the rule of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), or whether that policy would discriminate against a protected minority within the meaning of *DeShaney*'s footnote three.

## VII

For the reasons stated, the district court's denial of the individual officers' summary judgment motion is reversed, and all claims against those officers are dis-

missed. The appeal of the City is dismissed for want of appellate jurisdiction.

REVERSED in part, DISMISSED in part, and REMANDED.

GOLDBERG, Circuit Judge, concurring in part and dissenting in part:

Many police officers appear to treat domestic violence involving female victims less seriously than they treat assault between strangers.[1] Such a difference in treatment, if proven in a particular case, denies a woman the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution.

This case is before us on summary judgment. The majority holds that McKee, the nonmovant, has offered "no evidence at all" to support her equal protection claim, thus pretermitting a qualified immunity inquiry. *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). On this point, I respectfully but fervently disagree, although I believe that the officers, as sued in their individual capacities, are entitled to qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In addition, the majority offers extensive nonessential discussion with which I disagree, concerning (1) the application of *DeShaney v. Winnebago County Department of Social Services*, — U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), to equal protection claims; and (2) the officers' authority to arrest Streetman under Texas law. I discuss these issues in the course of my equal protection and qualified immunity discussion below. *See* Part I.

I dissent in Part II from the majority's dismissal of McKee's pendent state law claims. We should remand the issue of retaining jurisdiction over the pendent state law claims to the sound discretion of the district court. Finally, in Part III, I agree that the City of Rockwall may not invoke the collateral final order doctrine

---

1. *See* Comment, *Battered Women and the Equal Protection Clause: Will the Constitution Help Them When the Police Won't?*, 95 Yale L.J. 788

(1986). For the numerous statistical studies which bear out this observation see *Battered Women*, 95 Yale L.J. at 788–89 n. 3.

under 28 U.S.C. § 1291, noting that the majority's use of the phrase "interlocutory order" in this context, should not be confused with interlocutory appeals under 28 U.S.C. § 1292.

## I. QUALIFIED IMMUNITY AND EQUAL PROTECTION

The majority correctly holds that the plaintiff's section 1983 claim should be dismissed against the officers, in their individual capacities. The plaintiff's right to equal protection, in light of her summary judgment evidence, was not clearly established at the time of the incident in such a way that "a reasonable [police officer] would understand that what he [was] doing would violate that right." *Melear v. Spears*, 862 F.2d 1177, 1183 (5th Cir.1989) (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). I do not, however, agree with the majority's approach to the dismissal of plaintiff's section 1983 claim against the officers.

Instead of holding that the officers are entitled to qualified immunity, the majority holds that McKee has presented "no evidence at all" to support her underlying equal protection claim, thereby never reaching the immunity issue.[2] The majority, I believe, has erroneously read the summary judgment evidence against the non-movant, McKee.

Two summary judgment hurdles stand in McKee's way in this case. First, McKee must show that an issue of fact exists concerning the officers' authority under Texas law to arrest Streetman, McKee's boyfriend, as a predicate to McKee's claim that the police violated her right to equal protection by refusing to arrest Streetman. The majority discusses the issue at length, inconclusively stating it is "not clear" that the police would, under these circumstances, have developed the reasonable suspicion necessary to justify an arrest. As I shall demonstrate, McKee has presented sufficient summary judgment evidence to raise a jury question on this issue.

The second summary judgment barrier to McKee's claim concerns the elements of an equal protection violation. McKee maintains that the officers discriminated against her because she is a female. The majority holds that "no evidence" supports her claim of gender discrimination. I believe that McKee has offered summary judgment evidence sufficient to shoulder this burden, and I believe that the same evidence would allow a jury to infer the discriminatory intent necessary to find an equal protection violation. The majority does not reach this last issue. McKee's evidence is not extensive, but it allows the reasonable inference that the police treated her based upon illegitimate stereotypes and archaic notions of women.

### A. DeShaney and Equal Protection

I address an issue at the threshold that is not central to the majority's decision, but is sure to stand important in the future. The majority discusses at length the Supreme Court's recent decision of *DeShaney v. Winnebago County*, —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), stating that *DeShaney*, which concerns the substantive component of the Due Process Clause, is "nonetheless relevant to our analysis of this case," which concerns an equal protection claim. The majority apparently views *DeShaney* as a general statement that governmental officers, in their actions, enjoy a zone of discretion regardless of the Fourteenth Amendment right involved.

*DeShaney* should play no role in McKee's case. *DeShaney* seeks to define a bright line limit to the substantive component of the Due Process Clause. *See, e.g., Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (holding that substantive component of Due Process Clause does not protect the right to engage in homosexual sodomy). *DeShaney* specifically does not address claims based upon illegitimate distribution of public services in contravention of the Equal Protection

---

**2.** Of course, the majority's reasoning, that McKee has made out no claim, virtually preor-

dains judgment for the City of Rockwall on remand.

Clause. "The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). But no such argument has been made here." *DeShaney,* 109 S.Ct. at 1004 n. 3.

The Supreme Court states that the Due Process Clause was "intended to prevent [the] government 'from abusing [its] power, and employing it as an instrument of oppression....'" *DeShaney,* 109 S.Ct. at 1003. In "substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is, the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney,* 109 S.Ct. at 1006.

Equal protection values are not tied to the scope or limits of governmental discretion, but are tied, instead, to the government's obligation not to make illegitimate distinctions among those to whom the government provides services. "Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection." *Watson v. City of Kansas City, Kansas,* 857 F.2d 690, 694 (10th Cir.1988); *cf.* Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection,* 55 U.Chi.L. Rev. 1161, 1179 (1988) ("Equal Protection Clause ...is grounded in a norm of equality that operates largely as a critique of traditional practices").

Imagine that in *DeShaney,* Winnebago County had an intentional policy to intervene only in family abuse cases when the family is white, not to intervene when the family is black, that Joshua DeShaney was black and died because of the County's failure to intervene. The majority would have us believe that no equal protection violation exists because "[f]ootnote three

[of *DeShaney*] does not permit plaintiffs to circumvent the rule of *DeShaney* by converting every Due Process claim into an Equal Protection claim via an allegation that state officers exercised discretion to act in one incident but not in another."

The "democratic political processes" upon which the majority rests its hope that all people receive equal protection of the law is not adequate for the task of protecting people when distinctions are made upon suspect and quasi-suspect classifications. *See United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938); Bixby, *The Roosevelt Court, Democratic Ideology, and Minority Rights: Another Look at United States v. Classic,* 90 Yale L.J. 741, 746–60 (1981) (tyranny of the majority). We hold dear equal protection values, in large part, because the legislative process may fall short of the Constitution's commands. There can be no "discretion" to discriminate invidiously.

### B. Officers' Authority to Arrest Under Texas Law

McKee presented sufficient evidence to raise a jury question concerning whether the officers possessed authority to arrest Streetman without a warrant under Texas law. McKee's evidence is sufficient because the Texas legislature in 1985 broadened the authority of police officers to arrest without a warrant. Tex.Code Crim. Proc. Art. 14.03(2) (Vernon) (Sept.1985). McKee's assault occurred in 1986. To appreciate the legislative revision, one must understand the applicable rules of law before 1985. Traditionally, in Texas, an officer with probable cause could only arrest a suspect without a warrant in two situations: (1) if the officer *personally observed* the arrestee commit either a felony or a misdemeanor; or (2) if the officer had reason to believe that the arrestee committed a felony. *See* Tex.Code Crim.Proc. Art. 14.01 & 14.03 (Vernon) (1967).

Texas subdivides assault into simple assault (22.01) and aggravated assault (22.-

02).[3]  In Texas, the crime of simple assault is only a misdemeanor. Tex. Penal Code § 22.01 (Vernon). "A person commits [the offense of simple assault] if the person: (1) intentionally, knowingly, or recklessly causes *bodily injury* to another ... or (2) ... threatens another with *imminent bodily injury....*" Tex. Penal Code § 22.01. In contrast, the crime of aggravated assault is a felony. "A person commits [the offense of aggravated assault] if the person commits assault as defined in Section 22.01 of this code [simple assault] and the person: (1) causes *serious bodily injury* to another...." Tex. Penal Code § 22.02 (Vernon). The alleged crime of simple assault, a misdemeanor, is involved in this case.

As used in the assault statutes and the arrest statutes, the terms "bodily injury" and "serious bodily injury" are defined by statute. " *'Bodily injury'* means *physical pain,* illness, or any impairment of physical condition." Tex.Penal Code § 1.07(7) (Vernon) (emphasis added). *Serious bodily injury* is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex.Penal Code § 1.07(34) (Vernon).

Under the Texas assault statutes, and the pre–1985 arrest statutes, the officers would need to find evidence of "serious bodily injury"—an element of an aggravated assault, which is a felony—before they could arrest a person for an assault committed outside of their presence. For the officers to make a misdemeanor arrest for simple assault, an element of which is "bodily injury," either they would have to witness the incident or they would have to procure a warrant. To procure a warrant, it is necessary for the complaining party to file a complaint.

Effective September 1, 1985, the Texas legislature dramatically revised the applicable law. No longer is "serious bodily injury" necessary for an officer to be able to arrest a suspect without a warrant if the act of violence was committed outside of the officer's presence. A police officer "may arrest, without warrant: ... (2) persons who[m] the [police] officer has probable cause to believe have committed an assault resulting in *bodily injury* to another person and the [police] officer has probable cause to believe that there is danger of further *bodily injury* to that person...." Tex.Code Crim.Proc. Art. 14.03(2) (Vernon) (1985) (emphasis added). Only "bodily injury," the standard embodied in the simple assault statute, is now necessary for an officer, as of 1985, to be able to make an arrest in a case in which the officer did not observe the assault.

The majority states that "[t]he only evidence of the alleged assault was McKee's allegation. Yet the officers could see no physical indicia of an assault." Physical marks on a victim's body are not necessary to constitute bodily injury under Texas law. Texas requires that the victim experience *"physical pain,* illness or any impairment of any physical condition" for the victim to suffer "bodily injury" under the statute, Tex.Penal Code § 1.07(7), but this standard does not necessarily require welts, cuts, bruises or any other physical indicia of injury. Someone who is punched in the stomach may experience physical pain, but there may not be any "marks" or other physical indicia of the blow.

Texas courts have addressed clearly the physical pain/bodily injury issue. *Yarbrough v. Texas,* 656 S.W.2d 200, 200–01 (Tex.App.—Austin 1983) (a kick to a man's groin found to be sufficient physical pain to sustain the requirement of bodily injury); *Rangel v. Texas,* 747 S.W.2d 32, 32–33 (Tex.App.—San Antonio 1988) (slap to the face met bodily injury standard); *Madrigal Rodriguez v. Texas,* 749 S.W.2d 576, 578 (Tex.App.—Corpus Christi 1988) (placing a knife tip at a person's neck, without any evidence of the knife puncturing the victim's skin, gave rise to sufficient physical pain). The important factor is whether the victim experiences physical pain, not whether there is any physical indicia of a serious bodily injury.

---

**3.** A third category of sexual assault is not mate-  rial here.

McKee's summary judgment evidence gives rise to a jury question concerning whether a reasonable police officer would discern that McKee was experiencing physical pain, and therefore whether the officers had the authority to arrest Streetman under Texas law for simple assault, a misdemeanor. We accept the plaintiff's evidence, including the affidavit, as true at this stage in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.1987). All reasonable inferences are to be drawn in the plaintiff's favor. *See Phillips*, 812 F.2d at 272. We are not to judge the credibility of the witnesses at this stage; such judgments must be made by the trier of fact at the appropriate time.

In her affidavit responding to defendants' motions for summary judgment, McKee states:

"On and prior to April 30, 1986, I was living at the residence of Harry Streetman in Rockwall, Texas. On that date, I arrived home and was attacked and beaten by Mr. Streetman. I also discovered that Mr. Streetman had disabled my car and thereby prevented my escape. He also threatened me with severe personal injury." McKee goes on in her affidavit to state:

"I informed the officers of the following facts:

    A. That I had been physically assaulted by Harry Streetman.

    B. That Harry Streetman had made threats of severe bodily injury and death against me.

    C. That I was in fear of serious injury if Mr. Streetman was not restrained.

    D. That my personal effects were in Mr. Streetman's apartment and that he would not allow me to retrieve them.

Additionally, I requested that the police arrest Mr. Streetman or take me to my parents' home, a place of relative safety."

A reasonable inference from McKee's affidavit is that she experienced physical pain from Streetman beating and assaulting her. McKee told the officers that she had been assaulted and that she feared imminent bodily injury from Streetman. Tragically, her fear came true. However, the officers did not believe McKee so they left the scene. Shortly after their departure, Streetman knifed McKee.

At this summary judgment stage, it is inappropriate for a court to test the credibility of the affiant. The majority errs by engaging in discussion which properly should occur within the enclosure of the jury room. We have a classic conflict about exactly what evidence was before the officers when they refused to arrest Streetman. I disagree with the majority's reasoning and characterization of the evidence concerning the authority of the officers to arrest Streetman. Two very different versions—McKee's and the officers'—tell the story of what McKee told the officers on April 30, 1986. For summary judgment purposes, we must believe McKee. Consequently, we should find that McKee has presented evidence from which a reasonable jury could conclude that the officers had the authority to arrest Streetman for his beating of McKee before the officers arrived.

### C. McKee's Equal Protection Claim

McKee maintains that a *de facto* policy or custom of the police officers of Rockwall, which treats victims of domestic assault less seriously than victims of non-domestic assault, purposefully discriminates against women. McKee also maintains that the actions of the officers involved in this case reflect the City of Rockwall's policy or custom and demonstrate an acceptance of the *de facto* policy by the individual officers.

The majority's holding exists in its statements that McKee has offered "no evidence at all" and has completely failed to adduce facts supporting her claim of gender-based discrimination. I respectfully disagree. McKee, the nonmovant, has produced summary judgment evidence short on extensiveness but long on meaning to support her claim that the city's *de facto*

policy or custom, and the officers' individual actions, are not gender-neutral. Her evidence also allows an inference of purposeful or intentional discrimination, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), a necessary element of her claim. *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985); *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The majority does not reach the intent issue, but it is clear that the Supreme Court does not require a nonmovant to produce a smoking gun to advance past the summary judgment stage.

1. General Framework of Equal Protection Law Applicable to this Case

A broad understanding of equal protection doctrine aids one's inquiry in this complex area. The equal protection guarantee of the Fourteenth Amendment does not remove from the states and cities the ability to classify people, and accordingly treat the various categories differently. "Certain classifications, however, in themselves supply a reason to infer antipathy. Race is the paradigm. * * * Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination. [citation omitted]. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979).

"[The Supreme Court's] recent cases teach that such classifications must bear a close and substantial relationship to important governmental objectives, [citation omitted], and are in many settings unconstitutional." *Personnel v. Feeney*, 99 S.Ct. at 2293.

To decide whether evidence gives rise to an inference of gender discrimination, one must first determine whether the official action is gender neutral, or purposefully gender-based. Since the Supreme Court decided *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), and *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), a plaintiff, to utilize any sort of heightened scrutiny and thus realistically hope to demonstrate a violation of the Equal Protection Clause, must demonstrate that the action taken was taken in part with discriminatory intent or purpose. "*[Washington v.] Davis* does not require a plaintiff to prove that the challenged action rested solely on [sexually] discriminatory purposes. * * * When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [ ] judicial deference is no longer justified." *Arlington Heights*, 97 S.Ct. at 563.

In many cases, a plaintiff challenges a statute and asserts that the statute is not gender neutral. *See Feeney*, 99 S.Ct. at 2293. Sometimes a plaintiff is not challenging the enacted, positive law, but, instead, is challenging the administration of a neutral statute. Discriminatory treatment is also subject to equal protection analysis. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Because the exact words of a statute cannot be examined in a discriminatory treatment case, one must analyze the policies, customs, attitudes, understandings and practices of the entity or persons making the alleged distinctions. Is the treatment gender neutral from the viewpoint of the persons or entity making the distinction? If so, an examining court must engage in a secondary line of inquiry and examine any alleged discriminatory impact to determine whether the "adverse effect reflects invidious gender-based discrimination." *Feeney*, 99 S.Ct. at 2293. In contrast, if the entity or persons making the alleged distinction understand that men and women are purposefully treated differently through their actions—which in a discriminatory application case constitutes the "classification scheme"—then a court can conclude that the differing treatment is, in fact, gender-based. It is not necessary to receive a signed admission from one of the state actors that the differing treatment is invidious. Covert purposes and understandings are just as constitutionally rele-

vant as overt purposes, *see Feeney*, 99 S.Ct. at 2293, and are much more likely to be the *modus operandi* of those persons who purposefully discriminate by their actions against others based upon invidious reasons.

Those who discriminate on the basis of race and gender do not usually parade down main street with their banners of bigotry unfurled. As our society continues to change, purposefully discriminatory actions occur more frequently behind closed doors and within the recesses of the mind than in the open square of public discourse. But whether on the corner square or within the dark passageways of the mind, purposeful discrimination is still invidious.

It is not necessary that the person or entity making an alleged illegitimate distinction be Attila the Hun. Malice and evil will are not the constitutional standards. "[P]urposeful discrimination is the 'condition that offends the Constitution.' *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554." *Personnel v. Feeney*, 99 S.Ct. at 2293. A person who acts according to stereotypical notions, can act purposefully if the person consciously intends to accomplish the action undertaken. From generation to generation we pass down ideas and beliefs about how the world works. Some of these traditions are, in fact, generalizations which are only stereotypes of how women and men are different. A person who consciously believes in the truth of the stereotype acts purposefully when the person implements the stereotype in a particular situation. This sort of purposeful action is what the guarantee of the Equal Protection Clause is all about. *See generally Mississippi University for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) ("care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypical notions"). Continuity of a stereotype through the generations combined with a person's action pursuant to the alleged "truth," may be purposeful action on the person's part within the meaning of the Equal Protection Clause.

Imagine that the Greene family gets together every Sunday evening for supper. Mama Greene every week cooks a big meal. Most of the children and grandchildren attend. This is a family tradition: Sunday supper at Mama's table. When Anita Greene, the second daughter, thinks about what she is going to do next Sunday, she has to decide if she is going to eat supper at her parents' house. Maybe one week Anita decides she has too much work to do at the office, so she telephones her mother and tells her she cannot come on Sunday. The next week arrives, and Anita decides to go and have Sunday supper with the family. When she goes over to her parents' house and eats with the family, her actions are purposeful. She is a creature of free will. Anita *purposefully* goes and eats Sunday supper with her family, although her motivation in part results from habit. Sunday supper at the Greene house is a tradition.

Traditions may reflect purposes so ingrained that particularized decision-making instance by instance becomes unnecessary. Customs, traditions, and stereotypes often guide and motivate us in choosing what path we shall follow. Such choices can nevertheless be purposeful. Such purposefulness, when it is rooted in illegitimate notions of race or gender, is the sort of action that is not neutral under the Equal Protection Clause.

If an action is gender-based, then it is subject to heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see Reed v. Reed*, 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971). The Supreme Court's decisions establish "that the party seeking to ... classif[y] individuals on the basis of gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification. [citations omitted]. The burden is met only by showing at least that the classification serves 'important governmental objectives and the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *Mississippi University for Women v. Hogan*, 458 U.S.

718, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).

### 2. McKee's Equal Protection Evidence

McKee asserts that the City of Rockwall has a custom, practice, understanding or policy of treating domestic assault cases involving female victims less seriously then assault case involving strangers, thus denying her the equal protection of the law because such a custom or policy is an unconstitutional gender-based form of discrimination. McKee further maintains that the individual officers in this case have demonstrated through their actions similarly unconstitutional discrimination based upon gender.

The officers' decision not to arrest Streetman does not facially appear, at first glance, to be based upon considerations of gender. The officers did not state that they do not arrest domestic abuse suspects who beat women. If they had said this, of course, then the nonarrest of Streetman, assuming there was authority to arrest him, would on its face lead to the conclusion that gender discrimination entered into the nonarrest decision. Smoking guns, as I have discussed, are not required. Thus whether a reasonable jury could make factual findings from which one could infer that gender discrimination exists in this case depends on whether the attitudes and decisions of the Rockwall police concerning arrests in domestic violence situations, and in this case in particular, is supported by McKee's summary judgment evidence.

McKee presents two pieces of evidence which could permissibly lead to the inference that purposeful gender discrimination entered into the decision not to arrest Streetman: (1) the Chief of Police's statement; and (2) McKee's story of what happened to her.

### a. Police Chief's Statement

The affidavit of McKee's mother states that: "Within one or two days of the assault upon my daughter, my husband Roy McKee and I had a conversation with Chief Beaty of the Rockwall Police Department. During that conversation we asked the Chief why Harry Streetman had not been arrested when our daughter first called the police and reported his assault upon her. The Chief responded that his officers did not like to make arrests in domestic assault cases since the women involved either wouldn't file charges or would drop them prior to trial."

The Chief's statement explicitly distinguishes between men and women. According to the Chief, it is *women* who will not file charges, and it is *women* who will drop the charges prior to trial. The Chief concludes that because *women* act like this, police officers do not like to arrest their domestic assaulters. *See Balistreri v. Pacifica Police Dept.*, 855 F.2d 1421, 1427 (9th Cir.1988) (reversing district court dismissal of equal protection claim in domestic assault case; remarks of officers "strongly suggest ... an animus against abused women"); *compare Watson v. City of Kansas City, Kansas*, 857 F.2d 690, 696–97 (10th Cir.1988) (summary judgment for defendant on equal protection claim reversed with respect to classification scheme of domestic/nondomestic violence, affirmed with respect to gender-based claim because plaintiff presented "no evidence of either adverse impact or discriminatory purpose"); *see also Hynson v. City of Chester*, 864 F.2d 1026, 1030 (3rd Cir.1988).

The Chief's compacted but crucial statement is central to this case. Under our classification-based equal protection jurisprudence, whether a female plaintiff falls into a class of domestic abuse victims, or *female* domestic abuse victims, may determine the appropriate level of scrutiny a court conducts for her claim. The police chief's statement ("did not like to make arrests in domestic assault cases since the women involved ...") should be enough for McKee to move beyond summary judgment on her gender-based claim.

The labels domestic violence or domestic assault tend to hide the gender of the victims in such cases. Numerous scholarly studies have recognized that women are primarily the victims of domestic abuse. *Thurman v. City of Torrington*, 595 F.Supp. 1521, 1528 n. 1 (D.Conn.1984)

(quoting Leeds, *Family Offense Cases in the Family Court System:* "in 29 out of every 30 such cases the husband stands accused of abusing his wife"); *see* Comment, *Battered Women,* 95 Yale L.J. 788 (*cited* in note 1, *supra*). Our equal protection jurisprudence requires evidence of a classification; judicial notice will not do.

McKee has offered such evidence. When the Chief states—that women, not men, are the victims in "domestic" assault cases—the plaintiff hurdles a barrier which is extremely difficult to ascend. This supplies the understanding that domestic assault *affects* women. A general observation of our society confirms what the Chief easily recognizes, that is that women are the victims in domestic violence situations.[4] A Texas statute is a good example of the observation that women particularly suffer from violence in the home. The assault statute, Tex.Penal Code § 22.01 was amended in 1979 to include the underscored words: "A person commits an offense if he: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including his spouse...." The Texas legislature felt it was necessary to make it explicit that husbands cannot beat their wives. Presumably, before the Texas legislature made this clear, some people thought, and probably still think, that it is acceptable for husbands and boyfriends to beat their wives and girlfriends.[5] *See Thurman v. City of Torrington,* 595 F.Supp. 1521, 1528 (D.Conn.1984) (quoting from scholarly writings which set forth that at common law, husbands were permitted to beat their wives, within limits).

Women in their homes are vulnerable to the men with whom they live. Women's vulnerability is heightened by a police officer's hesitancy and sometimes refusal to invade the space of privacy which surrounds the family or unit of people living together. The Texas legislature has attempted to address and refute the historical belief that the curtilage of a *man's* home is sacrosanct. "A *man's* home is his castle" indeed. The officers' dislike affects *women.*

The Chief voices the sentiments and purposes of the officers he commands by stating that "*his* officers did not like to make arrests...." The buried feeling among his officers, according to the Chief's statement, which we must take as true, is that women are responsible for the officers' disinclination to make arrests in domestic assault situations. This blaming of the victim operates to deprive women of the protection of the police from assault based upon their status as women. The majority states that "a dislike is not a policy," and "one officer's dislike [is not] binding on another." The majority's construction of the evidence against nonmovant is inappropriate. A trial may demonstrate that a "dislike" and a *de facto* policy are one and the same. The Chief is certainly competent to discuss whether a particular action or response in a given situation is a custom or *de facto* policy of the officers he commands. The Chief's statement creates an issue of fact concerning the discriminatory treatment of women in domestic assault situations. This evidence should be enough for plaintiff to survive summary judgment concerning the viability of her equal protection claim.

#### b. McKee's Affidavit

The officers' interaction with McKee constitutes evidence that, when coupled with the Chief's statement, would allow a reasonable jury to find in favor of McKee's equal protection claim. Again, because this is case is presented in the posture of defendants' motions for summary judgment, we must treat plaintiff's evidence as true.

In her affidavit, quoted above, McKee informed the officers that Streetman had beat her, and that she feared that he would do so again because he had threatened her.

---

**4.** *See* note 1, *supra.*

**5.** In 1985, beyond the ordinary assault statutes, the Texas legislature, implicitly recognizing the attitude reflected in the Chief's statement, felt compelled to highlight the duties of police officers in domestic violence situations in Art. 5.04(a) of the Code of Criminal Procedure. *See* Code Crim Proc. Art. 5.01(a) (Vernon).

McKee states: "The officers present refused to drive me to my parents' home and refused to arrest Mr. Streetman. Instead, they said that I was *exaggerating the threat Mr. Streetman posed* to me and suggested that I *talk matters* out with him. * * * They also indicated that after I had calmed down I probably would not want to file a complaint. At this time, Mr. Streetman threatened to burn my belongings if I went to the station [to file a complaint]. The police did not respond." (emphasis added).

The treatment McKee received calls to mind the archaic and stereotypical usage of the word "hysteria." The Oxford English Dictionary, finally published in 1933 after 70 years of compilation, defines "hysteria" as follows: "1. Path[ological] A functional disturbance of the nervous system, characterized by such disorders as anaesthesia, hyperaesthesia, convulsions, etc., and usually attended with emotional disturbances and enfeeblement or perversion of the moral and intellectual faculties." The OED goes on to state: "Women being much more liable than men to this disorder, it was originally thought to be due to a disturbance of the uterus and its functions." The officers' accusation that McKee was "exaggerating the threat," and their suggestion that after she "calmed down," she would not want to file a complaint, remind me of the mores of the century preceding even my birth.

In the linguistic history of our society, it is common to find women referred to as hysterical; it is uncommon to find references to hysterical men. Two thousand years of Western Civilization's stereotypes are not easy to undo from the hearts of its people. McKee probably was upset. Such a response is extremely rational and understandable if Streetman had beat her and threatened her physical safety to the point of death, and the police stood by and did nothing to protect her.[6] There is nothing "hysterical" about such a response. In

contrast, Streetman threatened in the officers' presence to burn her belongings. The officers, who are all male, treated McKee's expressions in a condescending manner, while not responding to Streetman's threat. *See Balistreri v. Pacifica Police Dept.,* 855 F.2d 1421, 1427 (9th Cir.1988) (officer's comment that he "did not blame plaintiff's husband for hitting her because of the way she was 'carrying on' " suggests an animus against women).

### D. Clearly Established Constitutional Right?

The individual officers are before our Court seeking qualified immunity. "The defense of qualified immunity for government officials represents a compromise between the conflicting concerns of permitting the recovery of damages for vindication of constitutional rights caused by the abuse of public office and permitting government officers to perform discretionary functions without fear of harassing litigation. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)[.]" *Hynson v. City of Chester,* 864 F.2d 1026, 1031–32 (3rd Cir.1988). "[W]here an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the law." *Anderson v. Creighton,* 107 S.Ct. at 3039; *see also Melear v. Spears,* 862 F.2d 1177 (5th Cir. 1989).

I do not believe that a reasonable officer would know that a *de facto* city custom or policy, and his own actions manifesting the same notions, footed in stereotypes buried deeply in our culture, would violate the Constitution. No published decision in this

---

6. The majority focuses on the fact that McKee asked that the officers either arrest Streetman *o r* take her to her parents' house. Since the officers did not take McKee to her parents' house, the majority's reliance on this point does

not further us along the road of understanding. The refusal to transport McKee, like the refusal to arrest, rests upon the same stereotypical notion that police officers should not invade a *man's* castle.

426

Circuit sets forth such a theory of the Equal Protection Clause, and the Supreme Court has not spoken specifically on the subject. Qualified immunity is intended to protect individuals, when sued in their individual capacity, from personal liability when the area of law is evolving. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) ("If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful"); *see Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978).

One of the fundamental reasons for qualified immunity is to protect the individual officers' discretion unless that discretion must be reined in due to constitutional considerations. *Harlow v. Fitzgerald,* 102 S.Ct. at 2738 ("governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known"). The individual defendants should be granted summary judgment on McKee's section 1983 claim. Therefore, I concur in the majority's judgment dismissing the officers, in their individual capacities, with respect to plaintiff's section 1983 claim.

## II. PENDENT STATE LAW CLAIMS

I dissent only from the majority's dismissal of McKee's pendent state law claims against the individual defendants. This issue is not before us. Only a district court's denial of an official's defense of immunity is immediately appealable as a collateral order under 28 U.S.C. § 1291 and *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The district court should decide in its discretion upon remand whether the pendent state claims should be dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), permits the district court to retain jurisdiction of McKee's pendent state law

claims. Several factors would impinge upon the district court's discretion. For example, if the federal claim is not frivolous, the statute of limitations has run, no tolling provision applies, and the case has progressed significantly, the district court should retain the case.

## III. CITY OF ROCKWALL'S APPEAL

I agree with the majority that we lack appellate jurisdiction to hear the City of Rockwall's collateral final appeal pursuant to 28 U.S.C. § 1291 and *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2814–16, 86 L.Ed.2d 411 (1985). Although the majority uses the phrase "interlocutory appeal," I note that the officers' immediate appeal is properly before this court as a final, appealable collateral order pursuant to 28 U.S.C. § 1291 and *Mitchell v. Forsyth,* and not as an interlocutory appeal pursuant to 28 U.S.C. § 1292. To assert an interlocutory appeal pursuant to 28 U.S.C. § 1292, the City would have to receive a certification of interlocutory appealability pursuant to 28 U.S.C. § 1292(b) from the district court, which the City did not receive in this case. Believing that the majority's opinion is not inconsistent with my stated understanding of appealability, I add my concurrence to this portion of the majority's decision.

## CONCLUSION

The social mores of a generation are expressed often in the tribune of constitutional law. As our mores evolve, constitutional law evolves to reflect the beliefs that we now hold to be true and right. The history of race discrimination in this country is the paradigm which illustrates this principle most aptly. The folkways of a society are not the highest ideals of a people. The folkways are, instead, the everyday beliefs and accepted truths that guide our lives. There is a constant effort by all members of our society, conscious and unconscious, to accommodate, in a gradual adjustment, the folkways to the mores. The law often steps in to catalyze the process of adaptation. We saw this with the turmoil of the desegregation cases. At

this point in our history, we are now encountering a parallel adaptation phase involving gender-based discrimination.

It is my firm belief that we are ready to take another step to move the mores forward with the hope that in the end we will obtain a more just society. McKee's case is one step along the path. Recognizing that the folkways still lag a step or so behind the mores in this area, I concur in the majority's result granting the defendants' motions for summary judgment because I believe the officers are entitled to qualified immunity. I await the day when we have moved the mores, and their satellite the folkways, of gender to a higher and more noble plateau.