**Jack REEVES, by his next friend, Pamela JONES, Plaintiff,**

v.

**Arnold BESONEN and Owendale Gagetown Area Schools, Defendants.**

**Civ. A. No. 88–CV–75139–DT.**

United States District Court, E.D. Michigan, S.D.

Jan. 15, 1991.

**1136**

Brian R. Schrope, Caro, Mich., for plaintiff.

Charles Randau, Southfield, Mich., Frank M. Quinn, Bay City, Mich., David G. Dogger, Saginaw, Mich., Ronald D. Holton, Southfield, Mich., for defendants.

OPINION AND ORDER ACCEPTING, IN PART, AND REJECTING, IN PART, MAGISTRATE'S REPORT AND RECOMMENDATION, BUT GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

Presently before the Court is the Report and Recommendation of Magistrate Virgi-

nia A. Morgan filed October 11, 1990, in which the Magistrate recommends that the Court grant the Defendants' Motion for Summary Judgment. On October 19, 1990, the Plaintiff filed his Objections to the Report and Recommendation, and supplemented these on October 22, 1990. The Court has reviewed these papers as well as the Defendants' Motion for Summary Judgment, the Plaintiff's Response, and the briefs and other supporting materials filed by the parties. Pursuant to Local Rule 17(*l*)(2), the Court finds that a hearing is not necessary to resolve this matter and therefore orders its submission on the briefs and other papers filed by the parties.

As discussed more fully below, the Court agrees with the result reached by Magistrate Morgan in her Report and Recommendation—that the Defendants' Motion for Summary Judgment must be granted—and with the Magistrate's discussion concerning the alleged violation by the Defendants of the Plaintiff's rights secured by the Fourth Amendment, and the equal protection clause of the Fourteenth Amendment. But, the Court disagrees, in some respects, with the Magistrate's analysis concerning the Defendants' alleged violation of the Plaintiff's substantive due process rights under the Fourteenth Amendment. Accordingly, the Court rejects the Magistrate's Report and Recommendation *only* with respect to that particular substantive due process discussion, and otherwise adopts the Report and Recommendation.

FACTS:

The Plaintiff, Jack Reeves, was, at the pertinent times, a freshman high school football player for the Owendale–Gagetown high school. On October 17, 1986, Reeves and the other members of his team were returning home after a football game on the school bus designated for the team. The bus was driven by the school football coach, Defendant Arnold Besonen. Also present on the bus, in the seat behind the driver was the team's assistant coach, who is not named as a defendant here. Both

Coach Besonen and the assistant coach were employees of Defendant Owen–Gagetown Area Schools.

During this trip home, on the night of October 17, 1986, Reeves was called to the back of the bus by the older students on the team, including Nick Pavlichek (a sophomore at the time), with the incantation, "Jack, Jack, come on back," in order to become the victim of the team's "hit line" hazing ritual.

According to the deposition testimony of Nick Pavlichek, this "hit line" ritual consisted of the team members "roughing up" the other members of the team:

Q: [by Plaintiff's attorney] By going through it [the "hit line"], what do you mean? What would happen?

A: [Pavlichek] You go back to the back of the bus and they wouldn't pound on you, they'd just jump on you, rough you up. That's all it would be.

Q: Anybody get hit in the arm?

A: Oh, yes.

Q: With a closed fist?

A: Oh, yeah.

Q: Anybody get their underwear torn? Do a wedgy on them?

A: Oh, yeah, once in a while.

Q: Where they grab the underwear and pull it up around their crack?

A: Once in a while.

Q: Anybody ever lose their underwear?

A: Yeah, I have lost them quite a few times too.

Q: You have lost them too?

A: Oh, yeah.

Q: Did the coach know this was going on?

A: Not really.

Q: He's sitting there driving the bus and all this is going on?

A: Well, you know, he knows, but it was just part—

Q: Part of the fun?

A: Yeah. It's just football. You play football you are out to—You know, not to have no injuries or, you know. It's part of the fun.

Q: So, on October 17, 1986 what happened that Jack Reeves ended up with a busted nose if it was just fun?

A: It was just fun. I guess I hit him.

Q: Okay. Closed fist?

A: No.

Q: How did you hit him?

A: Forearm.

Q: Why?

A: Because I didn't—I wasn't trying to hurt him. I was just trying to, you know—I was just trying to—

Q: Bounce him around a little bit?

A: Back him off. It was just—

Q: He didn't try to hit you, did he?

A: Not—I don't know.

Q: Well, did you feel assaulted by him that you had to hold him off with your forearm or were you just bouncing him around back there having fun?

A: I wasn't touching nobody that night. I was sick. I was sitting in my seat doing nothing.

Q: So he was getting bounced around by other guys.

A: Yes.

Q: And he got bounced into you?

A: I don't know if he got bounced or tripped.

Q: Tell me how you happened to hit him in the nose with a forearm?

A: I stood up on the side of him and—I stood up and—

Q: Whacked him?

A: Yeah.

Q: Why though?

A: I didn't—

Q: If you were sick and sitting what would cause you to sit up and whack a guy with a forearm?

A: I was mad.

Q: Why?

A: Because I was minding my own business. I wasn't, you know—If I dish it out I expect to take it. But I wasn't doing nothing.

Q: Why were you mad at him? He hadn't come over and bothered you, had he?

A: He hit me. I was hit on the side of the head.

Q: But did he hit you is the question?

A: Who else would it be?

Q: Did you see him hit you?

A: I seen him standing there.

\* \* \* \* \* \*

Q: Well, what would cause Jack Reeves out of the clear blue to come back to the back of the bus and hit you of all people or did somebody push him into you?

A: Maybe. I don't know. Maybe someone pushed him. Maybe he was trying to get back to the front of the bus. Maybe he was tripped. I don't know.

Q: So you stood up and laid him in the nose with a forearm?

A: It wasn't meant to do harm. It was just—It wasn't meant to do harm.

Q: Then what happened after you hit him in the nose with a forearm?

A: I kind of kicked back and said, "Wow." I seen him on the ground and I went and helped him up. I grabbed my towel and helped him back to his seat. I apologized and I kept going back up there checking on him, seeing if he was all right and everything.

Q: Did he have his shirt torn off?

A: I don't think so, no.

Q: What about his pants torn off?

A: I don't know. I don't think so.

Q: You don't recall?

A: I wasn't worried about his clothes. I was just worried about his nose.

Q: Did any of the fun ever get carried away where somebody would get his shirt torn or his pants ripped?

A: Well, the most I have seen is underwear ripped.

Q: But guys get slugged in the arm?

A: Oh, yeah.

Q: And bounced around, knocked down, stuff like that?

A: Yeah.

Q: In fact, the coach participated some, did he not? He was called back and bounced around like everybody else.

A: Yeah, it's just part of the game. It's part of football. If you can't take hits, you know, you shouldn't be playing football.

(Pavlichek Deposition, pp. 7–12).

In addition to the Defendant, Coach Besonen, at least one member of the Owendale–Gagetown Area Schools board, Jack Brinkman, knew since 1975 that this "hit line" hazing ritual went on. (Brinkman Deposition, p. 4).

As a result of the incident on October 17, 1986, Plaintiff Reeves suffered a broken nose and contusions to his ribs, as well as attendant medical costs and alleged emotional distress.

In his First Amended Complaint, the Plaintiff states three claims. First, in Count I, he alleges that the above-described actions (or, more accurately, inaction) of Defendants Arnold Besonen and the Owen–Gagetown Area Schools constitute an actionable violation of 42 U.S.C. § 1983 in that they deprived the Plaintiff of the following rights secured by the United States Constitution:

1) the Fourth Amendment right to be secure in his person and effects against unreasonable seizure;

2) the Fourth Amendment right to be secure in his person against unreasonable and excessive force; and

3) the Fourteenth Amendment right not to be deprived of life, liberty, or property without due process of law, and the right to equal protection of the law.

In addition, Counts II and III of the First Amended Complaint articulate state law claims.

DISCUSSION:

■ In her Report and Recommendation, Magistrate Morgan states that the Court should grant summary judgment for the Defendants with respect to Count I, the federal civil rights claim under 42 U.S.C. § 1983, and dismiss the remaining claims for lack of federal subject matter jurisdiction. The Court agrees.

In order to recover under § 1983, the Plaintiff must prove: 1) that he was deprived of some right, privilege, or immunity secured by the Constitution or laws of the United States, 2) by a person acting

under color of state law. Since the Court finds, even viewing the evidence here in the light most favorable to the Plaintiff, that the Plaintiff was not deprived of any right, privilege, or immunity guaranteed by the United States Constitution or Statutes, summary judgment must be granted to the Defendants on the § 1983 claim.

The Court adopts the conclusions of the Magistrate with respect to the Plaintiff's Fourth Amendment claims and the alleged Fourteenth Amendment equal protection claim. The Court agrees with the Magistrate that the facts in this case cannot support the supposed Fourth Amendment violation by the Defendants here. There is no search and seizure here by any person acting under the color of state law. The equal protection claim has even less merit.

The Plaintiff's Section 1983 claim then boils down to an argument that the failure of the School District and, in particular, Defendant Besonen, to curtail the "hit line" hazing ritual and to prevent its repetition on the night of October 17, 1986 amounts to a deprivation of his substantive due process rights under the Fourteenth Amendment. However, the Supreme Court has made very clear (in far more serious circumstances) that substantive due process does not entitle every individual under the care of state authorities to protection from physical injuries:

> Petitioners contend, however, that even if the Due Process Clause imposes no affirmative obligation on the State to provide the general public with adequate protective services, such a duty may arise out of certain "special relationships" created or assumed by the State with respect to particular individuals.... Petitioners argue that such a "special relationship" existed here because the State knew that Joshua faced a special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger.... Having actually undertaken to protect Joshua from this danger—which petitioners concede the State played no part in creating—the State acquired an affirmative "duty," enforceable through the Due Process

Clause, to do so in a reasonably competent fashion. Its failure to discharge that duty, so the argument goes, was an abuse of governmental power that so "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), as to constitute a substantive due process violation....

> We reject this argument. It is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.... [W]e recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide adequate medical care to incarcerated prisoners. We reasoned that because the prisoner is unable *by reason of the deprivation of his liberty* to care for himself, it is only just that the State be required to care for him.

> ... [W]e extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their reasonable safety from themselves and others.... As we explained, if it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must also be unconstitutional under the Due Process Clause to confine the *involuntarily committed*—who may not be punished at all—in unsafe conditions.... [T]he Due Process clause requires the responsible government or government agency to provide medical care to suspects in police custody who have been injured while being apprehended by the police ...

> But these cases afford petitioner no help. Taken together, they stand only for the proposition that *when the State takes a person into its custody and holds him there against his will*, the Constitution imposes upon it a corresponding duty to assume some responsi-

bility for his safety and general well-being.... When a person is institutionalized—and wholly dependent upon the State, a duty to provide certain services and care does exist. The rationale for this principle is simple enough: *when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.*

*DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 1004–1006, 103 L.E.2d 249 (1989) (emphasis added) (footnotes and citations omitted).

It is clear to this Court that the actions of the Defendants here did not amount to a deprivation of the Plaintiff's *constitutional* rights. The injuries and indignities to which the Plaintiff was subjected took place at night in conjunction with the Plaintiff's voluntary participation on the school football team. There is no indication in the facts before the Court that his participation was compulsory, or that his riding the school bus on the night of October 17, 1986 amounted to "incarceration," or "involuntary commitment," or "police custody," or anything of that sort. In the absence of such State coercion, *DeShaney* makes clear that the *Constitution* imposes no duty on the state to care for the Plaintiff's safety.

*See Wood v. Ostrander,* 879 F.2d 583, 597–601 (9th Cir.1989) (Carroll, J., dissenting). *But see Walton v. Southfield,* 748 F.Supp. 1214, 1218–1219 (E.D.Mich.1990) (relies on *Wood* to establish constitutional duty on the part of law enforcement officers to care for the safety of minor passengers once the driver of their vehicle is arrested).[1]

If the Court were to accept the Plaintiff's argument here that the Constitution somehow imposes a duty on school officials to provide for the safety of students with respect to extracurricular activities, even though their participation in those activities is wholly voluntary, then there would no longer be any practical distinction between ordinary state-law negligence claims and federal constitutional violations, so long as the negligent party was acting under the color of state law. It is foreseeable, for example, that the Plaintiff's reasoning could be extended to school sports in general. The Plaintiff's theory here, if accepted, might be thought to impose a constitutional duty on school officials to protect student athletes—and, perhaps, others—from unreasonable risk of injury during athletic events both on and off the field. Similarly, the constitution might be construed to require school officials to make school property safe, not only with respect to students and others on the premises for legitimate purposes, but to outsiders (such as vandals or thieves) whose presence on public property is unauthorized, but nevertheless foreseeable.[2] The Plaintiff's theory in this case

1. In *Wood,* the Ninth Circuit Court of Appeals held that the actions of police officers in arresting a drunk driver, impounding his car, and then leaving his innocent passenger on the side of the road at night in a high-crime area, where the plaintiff was subsequently offered a ride and raped by a stranger, constituted a deprivation of the plaintiff's substantive due process rights under the Fourteenth Amendment. *Wood,* 879 F.2d, at 588. The dissenting opinion in *Wood* points out that *DeShaney* explicitly requires that the victim of assault by private actors be in "custody" before inaction by state officials in preventing the assault, no matter how negligent or willful, can amount to a deprivation of constitutional rights. *Wood,* 879 F.2d, at 599 (Carroll, J., dissenting) ("The State patently did not become the guarantor of Wood's safety when it arrested the drunken driver of the car in which

she was riding.") This Court agrees with the *Wood* dissent that the majority in that case improperly disregarded *DeShaney* when it held that a constitutional deprivation can be made out by the state's failing to protect the plaintiff from injury by non-state actors *where the liberty of the injured person is not first curtailed to the extent that the injured person is involuntarily arrested, institutionalized, or the like.* Accordingly, this Court declines to follow either *Wood* or *Walton* because these cases tend to extend the protections offered to individual citizens by the Fourteenth Amendment far beyond the limits imposed by the Supreme Court in *DeShaney.*

2. The Court can well imagine all manner of constitutional mischief which might result from adoption of theories such as that urged by the

might well contemplate the imposition of such duties by the Constitution upon state officials, but the Supreme Court, as indicated above, has never authorized such a broad construction of constitutional duties and deprivations. Instead, the remedies for such negligence on the part of state officials are adequately addressed in state tort law. *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981), *aff'd on other grounds sub nom Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) (assault and battery by state college football coach against player not cognizable under 42 U.S.C. § 1983 because of the existence of state tort remedies).

## QUALIFIED IMMUNITY

█ Even if the Plaintiff could show that the Defendants here did owe him a constitutional duty of protection against the assault by his fellow students, the doctrine of qualified immunity would shield the individual Defendant here, Arnold Besonen, from liability under § 1983. "The Supreme Court has made clear that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Eugene D. v. Karman,* 889 F.2d 701, 705 (6th Cir.1989), *cert. den.,* —— U.S. ——, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990) (quoting *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). In this respect, the Court notes that the Plaintiff's reliance on various police custody and Eighth Amendment prison cases do *not* "clearly establish" the Plaintiff's constitutional right to state protection from physical assault under the circumstances of this case. *Karman,* 889 F.2d, at 711 ("We may not impose personal liability upon state social workers because they failed to anticipate that principles of law developed in

other distinct contexts would be applied to them, for to do so would be contrary to the admonition in *Anderson v. Creighton,* 107 S.Ct. at 3039, that we should not allow plaintiffs to convert 'the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.' ").

More to the point, whether a constitutional right has been "clearly established" sufficiently to impose liability upon individual state employees depends upon "whether a constitutional right has been clearly established *in this circuit.*" *Karman,* 889 F.2d, at 708 (emphasis added). *See also Lum v. Jensen,* 876 F.2d 1385, 1389 (9th Cir.1989), *cert. den.,* —— U.S. ——, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). State officials are not required "to know and to follow the most advanced state of the law as established by a remote court of the land." *Karman,* 889 F.2d, at 708.

The United States Supreme Court has not yet even decided whether excessive corporal punishment inflicted *directly* by state employees against students *during mandatory school hours* can arise to the level of a constitutional violation. *See Ingraham v. Wright,* 430 U.S. 651, 679 n. 47, 97 S.Ct. 1401, 1416 n. 47, 51 L.Ed.2d 711 (1977) (court decided that Eighth Amendment's proscription against cruel and unusual punishment is inapplicable to schools, but left open the question whether excessive punishment might violate substantive due process). Other courts outside of this Circuit have held that excessive corporal punishment that "shocks the conscience" can be a violation of substantive due process when it is inflicted directly by school officials. *See, e.g., Garcia v. Miera,* 817 F.2d 650 (10th Cir.1987), *cert. den.,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *Woodard v. Los Fresnos Independent School District,* 732 F.2d 1243, 1246 (5th Cir.1984); *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980). However, the Sixth Circuit Court of Appeals did not adopt this

---

Plaintiff here. The Constitution of the United States is, and must be, a document of grandeur and wisdom which secures and protects the most fundamental and sacrosanct rights of our people. To extend the protections of the Consti-

tution to the most mundane fracases of everyday life cheapens and trivializes not only the Constitution itself, but those rights and privileges which are protected under it, as well.

proposition until September 17, 1987, *e.g.,* *Webb v. McCullough,* 828 F.2d 1151, 1158–1159 (6th Cir.1987), nearly one year after the October 17, 1986 incident at issue in the instant case.[3]

Even if cases from other circuits could be construed to create a constitutional right to be free from excessive corporal punishment by school officials *within this Circuit,* no case has gone so far as to state that school officials are constitutionally required to protect students from assaults by fellow students during extracurricular activities, even if the school officials were aware, as here, that some students were prone to "rough up" other students in connection with athletic events. *See D.T. v. Independent School Dist. No. 16,* 894 F.2d 1176, 1188, 1192 (10th Cir.1990) (evidence failed to support a § 1983 claim because there was no "state action" involved when students were sexually exploited by their teacher during off-season basketball camp activities "which were not related to school activities").

CONCLUSION

The Court thus concludes that, even taking the facts in this case in the light most favorable to the Plaintiff, he has no claim under 42 U.S.C. § 1983. The Court need not decide whether the facts in this case state a claim under state law, since the dismissal of the federal claims removes the underlying basis for this Court's subject matter jurisdiction, under 28 U.S.C. § 1331. Instead, the Court will dismiss the pendant state law claims without prejudice so that they may be brought in the appropriate state court. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Webb, supra,* 828 F.2d, at 1160; *Kitchen v. Chippewa Valley Schools,* 825 F.2d 1004, 1009 (6th Cir.1987).

For the reasons stated herein, and the Court being otherwise fully advised in the premises;

IT IS HEREBY ORDERED, AD-JUDGED, AND DECREED that the Defendants' Motion for Summary Judgment with respect to the federal claims is GRANTED and Count I of the Plaintiff's First Amended Complaint is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED, AD-JUDGED, AND DECREED that the remaining claims in the First Amended Complaint are DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED AC-CORDINGLY.

---

**3.** The Sixth Circuit Court of Appeals reached a similar conclusion in an *unpublished* opinion in *Rogers v. Board of Education of Paducah, Kentucky,* 745 F.2d 58 (6th Cir.1984).