**Joanne WAS, Antoinette Was, Melina Was, Deborah Sweeney and Debbie Jermanus, Plaintiffs,**

**v.**

**Coleman YOUNG, Stanley Knox, Cassandra Rutherford, City of Detroit and Dayton Hudson Corporation, a Minnesota corporation, Jointly and Severally, Defendants.**

**No. 91–CV–73726–DT.**

United States District Court, E.D. Michigan, S.D.

May 22, 1992.

Larry Bennett, Detroit, Mich., for plaintiffs.

John P. Quinn, City of Detroit, Law Dept., Detroit, Mich., for defendants City of Detroit, Young and Knox.

Mark Willmarth, Detroit, Mich., for defendant Dayton Hudson Corp.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

EDMUNDS, District Judge.

### I. INTRODUCTION

This case arises out of beatings which allegedly occurred during the 1991 Freedom Festival Fireworks display held on June 28, 1991 at the Hart Plaza in downtown Detroit. Plaintiffs Joanne Was, Antoinette Was, Melina Was, Deborah Sweeney and Debbie Jermanus contend that the City of Detroit and the Dayton Hudson Corporation, co-sponsors of the event, are responsible for the injuries they incurred as a result of the beatings. Plaintiffs claim that Defendants violated their Fourteenth Amendment due process rights by inducing them to come downtown without providing adequate control of the area, and by failing to protect or assist them during and after the fireworks display. Defendants have moved to dismiss Plaintiffs' complaint for failure to state a claim under federal law. Having heard the arguments of counsel, and having reviewed the parties' submissions and the applicable law, the Court concludes that Plaintiffs have not stated a claim for which they are entitled to relief from this Court. The Court therefore grants Defendants' motions to dismiss, as follows:

### A. *Facts*

The following facts are derived from Plaintiffs' First Amended Complaint. Plaintiffs attended the fireworks display, which was held in the Hart Plaza area. They parked their car near the Millender Center. After viewing the fireworks display, Plaintiffs prepared to walk back to their vehicles, when they were attacked by a group of people, including Defendant Cassandra Rutherford; and at the time of the attack, there were several hundred thousand people in the Hart Plaza area. Plaintiffs state that the police ignored their requests for assistance both during and after the attack; and that they refused to identify or arrest the perpetrators of the attack, take a report of the incident, or provide protection or safe transportation to the Plaintiffs. Plaintiffs then left the scene and took Plaintiff Joanne Was to the hospital for medical care. Plaintiffs claim that their injuries include physical injuries from being beaten; fear; embarrassment; pain and suffering; and emotional distress.

### B. *Claims*

As a basis for imposing liability on Defendants City of Detroit, Mayor Coleman Young, Chief of Police Stanley Knox (hereafter "City Defendants") and Defendant Dayton Hudson Corporation, Plaintiffs allege that the City of Detroit and Dayton Hudson Corporation jointly sponsored, financed, and presented the fireworks display. Plaintiffs state that Defendants had knowledge that at least several thousand people would be attending the fireworks display, and that as a result of this knowledge, Defendants implemented street closures and blockades to accommodate the anticipated crowd. It is also alleged that Defendants took actions to give the public the appearance that it was safe to attend the display, including deliberate efforts to prevent public knowledge of crimes during previous fireworks displays. Further, Plaintiffs assert that there was excessive illegal activity occurring during the event, which the police deliberately ignored; and that Defendants had permitted such conditions to exist at prior fireworks displays. Finally, Plaintiffs maintain that Defen-

dants failed to train or equip a security or police force to protect invitees to the festival.

Plaintiffs' Complaint has four counts. Count I alleges a violation of 42 U.S.C. § 1983. Count II alleges that conditions at the fireworks display amounted to a public nuisance which caused their injuries. Count III alleges that Plaintiffs were invitees of Dayton Hudson at the fireworks, and that Dayton Hudson owed Plaintiffs a duty based upon premises liability to warn of dangers at the site. Finally Count IV asserts that Defendants obstructed their access to the courts in violation of 42 U.S.C. § 1985.

The City Defendants and Dayton Hudson Corporation have each filed motions to dismiss. The City Defendants argue that they owed no duty to Plaintiff under the Due Process Clause of the United States Constitution; and that they did not obstruct Plaintiffs' access to the courts. In addition, Defendants Knox and Young assert that Plaintiffs have failed to plead facts sufficient to establish direct responsibility for the alleged acts; and that in any event they are protected from liability under the doctrine of qualified immunity. Defendant Dayton Hudson argues that it was never properly added as a defendant to the case; that Plaintiffs have failed to allege a constitutional violation; that it is not a state actor and that it did not willfully participate in any actions of the City which allegedly violated Plaintiffs' constitutional rights. Finally, Dayton Hudson maintains that Plaintiffs' claims of public nuisance and premises liability fail under the law and facts of this case.

### C. *Procedural Posture*

This case is presently before the Court on motions to dismiss under Fed.R.Civ. A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court must accept as true all factual allegations in the complaint. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984).

## II. LEGAL STANDARDS GOVERNING CLAIMS UNDER 42 U.S.C.1983

To prevail in a civil rights action under 42 U.S.C. § 1983,[1] a plaintiff must plead and prove that the defendants, acting under color of state law, deprived the Plaintiff of a right secured by the Constitution and law of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Section 1983 alone creates no substantive rights; rather it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or federal laws. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). The statute applies only if there is a deprivation of a constitutional right. *See e.g., Paul v. Davis,* 424 U.S. 693, 699–701, 96 S.Ct. 1155, 1159–1160, 47 L.Ed.2d 405 (1976); *Baker,* 443 U.S. at 146–47, 99 S.Ct. at 2695–96; *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 352 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). Thus, "[t]he first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'" of the United States. *Baker,* 443 U.S. at 140, 99 S.Ct. at 2692.

The claimed constitutional basis for liability in this case is the Due Process Clause of the Fourteenth Amendment, which pro-

---

1. Section 1983 provides in pertinent part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
   42 U.S.C. § 1983.

vides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Specifically, Plaintiffs contend that Defendants deprived them of their liberty interest when they failed to adequately inform and protect them from a known risk, which Defendants played a part in creating.

In general, state officials are not constitutionally obligated to protect members of the public at large from crime. *See DeShaney v. Winnebago County of Dept of Social Servs*, 489 U.S. 189, 195–197, 109 S.Ct. 998, 1003–1004, 103 L.Ed.2d 249 (1989); *Martinez v. California*, 444 U.S. 277, 284–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481 (1980); *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 700 (9th Cir. 1990); *Bowers*, 686 F.2d at 618. This is because "[t]he Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary as maintaining law and order." *Bowers*, 686 F.2d at 618. The Supreme Court has observed:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*DeShaney*, 489 U.S. at 195–197, 109 S.Ct. at 1003–1004 (internal citations omitted). In other words, the due process clause it not usually implicated by government *inaction*, but rather by government *action*. *See generally*, MARTIN A. SCHWARTZ, JOHN E. KIRKLIN, SECTION 1983 LITI-GATION: CLAIMS, DEFENSES, AND FEES (2d ed. 1991). Thus, the most frequent situation in which a constitutional deprivation occurs is when a state official himself takes affirmative action to violate the protected right. *See, e.g., Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (where local law enforcement officials themselves beat a citizen to death).

### A. *The Custody Requirement*

Where cases involve persons in state custody, the Supreme Court has recognized an exception to the principle that there is no constitutional duty to provide personal security. In such cases the Court has imposed an affirmative constitutional duty on the state to provide for basic needs. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Eighth Amendment requires state to attend to prisoner's serious medical needs); *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntarily committed mental patients have substantive rights to personal security under the due process clause); *Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (due process clause requires state to provide medical care to suspects in police custody). The rationale behind this principle is basically that:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his behalf.

*DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005.

The Supreme Court recently explored the parameters of the state custody exception in *DeShaney*, where the Court examined its application outside the context of institutionalization or incarceration. In that case, the guardian ad litem of a minor child brought suit against state social workers who failed to remove him from his father's custody even though they had recorded multiple incidents of physical abuse and had temporarily placed the minor in the custody of the juvenile court. The Supreme Court declined to impose a constitutional affirmative duty of care and protection for Joshua DeShaney upon the State, emphasizing that the beatings occurred while the child was in the custody of his father, a private actor, and not while he was in the custody of the state.

In refusing to extend the state custody exception to these circumstances, the Court rejected the argument that a "special relationship" somehow existed between Joshua DeShaney and the State because the State might well have been aware of the dangers he faced, since "it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201, 109 S.Ct. at 1006. That the State had once taken temporary custody of Joshua did not alter the analysis, "for when it returned him to his father's custody, it placed him in no worse position than that in which he could have been had it not acted at all ... the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* Thus, "[u]nder these circumstances, the State had no constitutional duty to protect Joshua." *Id.*

Other cases, both pre- and post-*DeShaney*, have focused on the concept of "state custody" for purposes of § 1983 liability. The courts have considered the parameters of the state's responsibility for persons in actual custody, i.e. prisons, and have also attempted to define the limits of functional custody, where the State has exercised some degree of control or restriction which is less complete than that in a police station or prison. One primary situation where courts have found "functional custody" is where a child who has been placed in a foster home by the state is mistreated by his or her foster parents. In finding a constitutional duty to protect for purposes of § 1983 liability, these courts analogize to *Estelle* and *Youngberg*.[2] *See Taylor ex rel Walker v. Ledbetter*, 818 F.2d 791 (11th Cir.1987) (en banc), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Dept. of Social Serv.*, 649 F.2d 134 (2d Cir.1981), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The Sixth Circuit recently embraced this view in *Meador v. Cabinet for Human Resources*, 902 F.2d 474, (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990), holding that "due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes." *Id.* at 476 (relying in part on *Taylor* and *Doe* ).

Another example of functional custody is found in *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720 (3rd Cir.1989), a post-*DeShaney* decision, where the Third Circuit stated that a public high school student who had been sexually assaulted by a teacher might be considered to be in "custody" for purposes of § 1983 liability. The Third Circuit reasoned that because the students attendance in school is required under state law, they "are in what may be viewed as functional custody of the school authorities" during school hours.[3] *Id.* at 723 (adhering to its original analysis before remand in *Stoneking I*, 856 F.2d 594, 603–04 (3rd Cir.1988)). *See also Lopez v. Houston Indep. School Dist.*, 817 F.2d 351 (5th Cir.1987) (school bus driver's failure to protect children from injury inflicted

---

**2.** The Supreme Court recognized this analogy in *DeShaney*, but explicitly reserved the question of whether a child abused in a foster care home would have a § 1983 cause of action since the issue was not properly before it. *DeShaney*, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9. *See also*

*Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir.1990).

**3.** The *Stoneking* discussion of functional custody is dicta, since the Court ultimately relied on its finding that the teacher was a state actor, making the custody issue less important.

by other students or provide emergency aid constituted a violation of due process); *Pagano v. Massapequa Pub. Schools,* 714 F.Supp. 641 (E.D.N.Y.1989).

In contrast, one court in this District has refused to extend the concept of functional custody to protect a student engaging in extracurricular activities. In *Reeves ex rel Jones v. Besonen,* 754 F.Supp. 1135 (E.D.Mich.1991), a high school football player was injured during a hazing incident on the team bus. In refusing to find liability, the court reasoned: "The injuries and indignities to which plaintiff was subjected took place at night in conjunction with the plaintiff's voluntary participation on the school football team. There is no indication in the facts before the court that his participation was compulsory, or that his riding the school bus on the night of October 17, 1986 amounted to 'incarceration,' or 'involuntary commitment,' or 'police custody,' or anything of the sort." *Id.* at 1140.

The Third Circuit used the concept of functional custody to uphold a § 1983 claim where a police officer, in accordance with a municipal policy of deferring to private clubs to investigate thefts, left an employee who was suspected of a theft in the owner's custody pending investigation of the crime. The employee was later beaten to death at the hands of the club owner. The court held that the officer's acts constituted placement of the employee in state custody at the time of the fatal beating. *Horton v. Flenory,* 889 F.2d 454 (3rd Cir. 1989) (post-*DeShaney*). The owner of the club was an ex-police officer well-known to the defendants. The investigating officer did not take the victim out of the club, despite the victim's request for protection, stating that he felt that the victim "was in good hands."

The Third Circuit rejected the defendants' argument that under *DeShaney* there are no circumstances in which a municipality or a police officer has an obligation to protect persons from private violence. Rather, the court stated that the holding in *DeShaney* "is limited [ ] to situations in which the state is not involved in the harm, either as a custodian or as an

actor." The court found sufficient evidence to permit a finding that the plaintiff was in state custody at the time of his fatal beating. The Third Circuit distinguished *DeShaney* stating, "[u]nlike the passive role of the neglectful social workers in *DeShaney,*" the role of the state actor here, [the investigating officer] could be found from the evidence to be anything but passive. *Horton,* 889 F.2d at 458.

The Sixth Circuit recently considered the custody issue in an unpublished decision, *Higgs v. Latham,* 946 F.2d 895 (6th Cir. 1991), refusing to extend a constitutional duty to a *voluntarily* committed patient in a state hospital. In that case the plaintiff claimed that she was sexually assaulted by a fellow patient while she was temporarily but involuntarily committed to Western State Hospital, an institution operated by the commonwealth of Kentucky. The commitment was pursuant to an order of temporary detention issued by a state district judge. Upon the plaintiff's arrival at the state hospital, however, she filled out all the necessary forms to have herself admitted as a voluntary patient, and was in fact admitted on that basis.

The Sixth Circuit rejected the district court's reliance on *Youngberg,* finding instead that the case was governed by *DeShaney.* Even though there had been an attempt by the state to restrain the plaintiff's freedom by involuntary commitment, the only "active agent of restraint" in the case was the state hospital, which was unaware of any commitment order. "Thus, there was no 'affirmative act' by the hospital to deprive [the plaintiff] of her liberty, and therefore no triggering of the state's constitutional duty to protect those it renders helpless by confinement."

As the foregoing cases illustrate, lower courts have been willing in some instances to extend the state custody exception beyond the actual confinement of *Estelle* and *Youngberg.* In each of those cases, however, there was some kind of physical restraint by the state which triggered the affirmative constitutional duty of care and protection. Even with the broadest possible reading of the functional custody cases,

there is nothing in the present case to justify a finding of functional custody. Unlike the school cases, Plaintiffs here were not required by law to attend the fireworks; and in contrast to the foster care cases, they were not physically placed downtown by the state. Instead, Plaintiffs chose to attend the fireworks event; in other words, their attendance was purely voluntary and not at the state's compulsion.

Furthermore, the "area of confinement" in this case, downtown Detroit, is not analogous to a foster home, a high school, a bar, a jail, a state hospital, or even a school bus. In *Tucker v. Callahan*, 867 F.2d 909 (6th Cir.1989), a Sixth Circuit case decided before *DeShaney*, the Court refused to find § 1983 liability where an on-duty officer sat by and watched as the plaintiff Mitchell Tucker was severely beaten. The beating occurred in the parking lot of the Harbour Inn, a tavern located in New Johnsonville, Tennessee. The inn had an agreement with the New Johnsonville Police Department whereby the police agreed to assume responsibility for controlling behavior in the tavern parking lot due to numerous incidents of violence in the preceding months. The defendant officer failed to intervene or render medical assistance after the incident was over. In declining to find § 1983 liability, the Sixth Circuit found no custodial or special relationship even though the police department had agreed to guard the parking lot, stating that "[a]t most, the agreement extended the New Johnsonville Police Department's influence from the city streets into the Harbour Inn parking lot." *Tucker*, 867 F.2d at 914. Thus the Court declined to utilize the functional custody concept to extend § 1983 protection to a geographic area which the police had committed to protect.

In this case, the area in question, even with barricades and other traffic control devices, is larger and less defined than the area at issue in *Tucker*. Therefore as in *Tucker*, the restraint in this case is insufficient to trigger an affirmative duty on the Detroit Police Department to prevent Plaintiff's injuries; and, as in *Tucker*, defendants' inaction is not enough to make out a federal constitutional claim.

### B. *"Special Relationship" and "Creation of Danger"*

Although *DeShaney* made clear that there is no general special relationship doctrine, *see* 489 U.S. at 197–200, 109 S.Ct. at 1004–06; *see also* SECTION 1983 LITIGATION, § 3.3 at 101; some lower federal courts have held the state accountable for a victim's injuries even though the victim was not in state custody, where the state has created a danger to the victim. This analysis is alternatively known as the "creation of danger" or "special relationship" analysis. *See e.g., Cornelius v. Town of Highland Park*, 880 F.2d 348 (11th Cir. 1989); *Tucker v. Callahan*, 867 F.2d 909 (6th Cir.1989); *Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277 (6th Cir.1987) (en banc).

In *Cornelius v. Town of Highland Lake*, 880 F.2d 348, a case decided after *DeShaney*, The Eleventh Circuit denied summary judgment on a § 1983 claim where the plaintiff town clerk was abducted and terrorized by two prison inmates assigned to a community work squad program. At the time of the plaintiff's abduction, the inmates were performing public work projects near the town hall where the plaintiff worked. The inmates had access to maintenance tools which included knives, axes, and picks. The plaintiff claimed that the Town of Highland Lake and its officials owed her a duty to provide adequately trained officials to supervise the inmate work squads, and to ensure that only nonviolent property offenders worked in the community. The court held that there were genuine issues of material fact as to whether a special relationship existed between the plaintiff and the defendants, and whether the defendants were aware of the danger the state had created.

The court found *DeShaney* distinguishable, stating, "defendants did indeed create the dangerous situation of the inmates' presence in the community by establishing the work squad and assigning the inmates the work around the town hall;" and noted that as town clerk, the plaintiff had to

work in an environment created and controlled by her superiors. 880 F.2d at 356. The court stressed that the state's custody and control over the inmates distinguished it from cases where an inmate injures or kills another after he has been released from state protective service. *Cf. Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (murder victim of prisoner released on parole did not state a cause of action where inmate had been released five months before the murder and parole board had no knowledge that he would seek out this particular victim); *Carlson v. Conklin,* 813 F.2d 769 (6th Cir. 1987) (kidnap and sexual assault victim failed to state claim against director of department of corrections for placing inmate in halfway house as too remote from crime committed by inmate); *Janan v. Trammell,* 785 F.2d 557 (6th Cir.1986) (state not liable for murder committed by parolee after release); *Jones v. Phyfer,* 761 F.2d 642 (11th Cir.1985) (failure to warn rape victim of assailant's release on Christmas furlough six months after he had been convicted of breaking and entering into her house failed to state cause of action).

The court also found that a genuine issue of fact was present under a special danger analysis. It found that the defendants affirmatively created a dangerous situation by bringing inmates into the community via the work squad program. This situation, when combined with the culpable actions of the prison and town officials and the status of the plaintiff as the town clerk, "effectively operated to place her in a position of danger distinct from that facing the public at large." *Cornelius,* 880 F.2d at 357.

In reaching this conclusion, the Eleventh Circuit relied in part on a Sixth Circuit case, *Nishiyama v. Dickson County,* 814 F.2d 277. In *Nishiyama* the county sheriff's department had an established practice of entrusting an inmate with a fully equipped squad car and allowed him to perform official and personal tasks for himself, the sheriff and the deputy sheriff. During one of the inmate's unsupervised excursions, he stopped the plaintiff's daughter by flashing the car's blue lights and then beat her to death. On the evening of the murder, the inmate had driven one of the deputies home and was instructed to return, unsupervised, to the county jail. The inmate drove around for ten hours before returning. The sheriff's department made no effort to find him during this time, despite having been notified by officials from a neighboring county that the inmate was at large and stopping motorists with the squad car.

Distinguishing the *Nishiyama* case from *Martinez* and its progeny, the Sixth Circuit en banc stressed the custodial relationship between the inmate and the prison officials, and the fact that the state had provided the specific means and opportunity for the crime by giving him the vehicle.

> In [*Martinez,* et al] the state officers possessed information that circumstances endangering the public existed. Yet in none of the cases did the state officers by their acts facilitate the crime by providing the criminal with the necessary means and the specific opportunity to commit his crime.... In the present case, the officers gave [the inmate] the car *and* the freedom to commit the crime."

*Id.* at 281 (emphasis in original). Thus the court found that the plaintiffs had stated a cause of action under § 1983.

The narrowness of the "creation of danger" or "special relationship" exception described in *Cornelius* and *Nishiyama,* however, is illustrated in two post-*DeShaney* decisions, *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696,[4] and *McKee v. City of Rockwall,* 877 F.2d 409 (5th Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 727, 107

---

**4.** *Balistreri* was originally decided prior to *De-Shaney.* 855 F.2d 1421 (9th Cir.1988). In the initial ruling, the Ninth Circuit found that a special relationship existed between Ms. Balistreri and the police department because the department had information that the plaintiff had been harassed by her husband and because she had obtained a restraining order from the state court preventing him from any contact with her. The Court of Appeals recalled the decision after the Supreme Court issued *DeShaney,* and completely reversed its position.

L.Ed.2d 746 (1990).[5] In *Balistreri* the Ninth Circuit held that the due process clause did not require the police to protect the plaintiff, a victim of alleged beating by her estranged husband. Balistreri had repeatedly complained to the police and had investigated a number of incidents. The court found no special relationship, despite the plaintiff's claims that the police knew of her plight and affirmatively committed to protect her when the state issued a restraining order. The Ninth Circuit relied in part on *DeShaney*, concluding that "the state's knowledge of DeShaney's plight and its expressions of intent to help him were no greater than its knowledge of Balistreri's plight and its expressions of intent to help her." *Balistreri*, 901 F.2d at 700.

Similarly, in *McKee*, the Fifth Circuit refused to hold the City of Rockwall, Texas liable for injuries which the plaintiff allegedly sustained after the police refused to arrest her boyfriend in response to her call for help. The plaintiff alleged that the non-arrest was the result of a city policy that discriminated on the basis of gender. The court, invoking *DeShaney*, held that even though the police officers had the authority to arrest the boyfriend, they had no constitutional duty to do so. "This is the lesson of *DeShaney*: that law enforcement officers have authority to act does not imply that they have any constitutional duty to act." *Id.* at 414.[6]

■ As *Balistreri* and *McKee* establish, after *DeShaney*, mere awareness of a danger to the victim, without more, will not be sufficient to create a constitutional duty on the part of the state. The crucial additional factor in both *Cornelius* and *Nishiyama* was that the actor or perpetrator was in state control or custody. Furthermore, in both of those cases the defendants had taken affirmative action to provide the inmates with the opportunity and the freedom to commit the crime.

■ In this case, by contrast, there is nothing in the record to indicate that the defendants had any knowledge that the perpetrators would attack Plaintiffs. More importantly, it is nowhere alleged that Plaintiffs' attackers were at any time in the custody or control of Defendants. Absent some kind of custodial relationship between the state and either Plaintiffs or their attackers, no constitutional duty can be imposed on Defendants. While Defendants' failure to protect Plaintiffs may be a failure of good government, it is not a constitutional violation.

### C. *Defendants' Policy or Custom*

■ Plaintiff also argues that Defendants' alleged policies and official actions regarding management of the fireworks event were grossly negligent or in reckless disregard of Plaintiffs' constitutional right

---

**5.** In a post-*DeShaney* decision from the Ninth Circuit, *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), the court held that the plaintiff had stated a claim that her substantive due process rights had been violated by the actions of police officers when they left her on the side of the road at night in a high crime-area after arresting the driver of the car in which she was riding. The plaintiff was subsequently offered a ride by a stranger who raped her. The Ninth Circuit found that although the officer did not himself assault the plaintiff, he allegedly acted in callous disregard for the Ms. Wood's personal security. *Id.* at 589. *See also Walton v. Southfield*, 748 F.Supp. 1214 (E.D.Mich.1989) (court relied on *Wood* in holding that driver of a vehicle had stated a § 1983 claim where arresting officers abandoned minor passengers), *appeal docketed*, No. 91–2115 (6th Cir. Oct. 2, 1991). In *Reeves*, the court declined to follow either *Wood* or *Walton*, agreeing with the dissent in *Wood* that these cases extend the Fourteenth Amendment rights of individual citizens

far beyond the limits set by the Supreme Court in *DeShaney*. *See Reeves*, 754 F.Supp. at 1140 n. 1 (citing *Wood*, 879 F.2d at 599 (Carroll, J., dissenting)). This Court agrees with the position expressed in *Reeves* and in the *Wood* dissent, and likewise declines to follow those cases. Moreover, *Wood* and *Walton* are distinguishable from the instant case because the police had created the danger to specific individuals, similar to the risk created to the town clerk in *Cornelius*.

**6.** Although the plaintiff in *McKee* asserted a violation of equal protection rather than due process, the court found *DeShaney* relevant to the analysis, because the Supreme Court opinion "endorses the general principle that choices about the 'extent of governmental obligation' to protect private parties from one another have been left 'to the democratic political processes.'" *McKee*, 877 F.2d at 413 (citing *DeShaney*, 489 U.S. at 203, 109 S.Ct. at 1007).

to freedom from bodily harm. In support Plaintiffs rely on *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Horton v. Flenory,* 889 F.2d 454; *Ward v. City of San Jose,* 737 F.Supp. 1502 (N.D.Cal.1990); and *Stoneking,* 882 F.2d 720.

In *Ward,* which Plaintiffs relied on heavily during oral argument, three police officers accidentally shot and killed Anton Ward in his own backyard during the course of a drug raid. Plaintiff had claimed that the officers' conduct leading up to the shooting, i.e., the manner in which the drug raid was being conducted, violated Anton Ward's constitutional rights. The jury implicitly found in their answers to special interrogatories that the police conduct was reckless, even if justified, and the court denied defendants' motion for judgment notwithstanding the verdict. Although the court's opinion included some discussion of police policy and practice, as well as discussion of custody and creation of danger, the overriding distinguishing factor in *Ward* is that the perpetrators of the wrong in that case were the police officers, thus establishing the most obvious and compelling case of state action. By contrast, in the instant case, the attackers were third parties, and Plaintiffs seek to hold the City of Detroit liable for its inaction.

Plaintiffs miss the mark when they rely on *Ward* and argue that they sustained a Fourteenth Amendment deprivation based on the policy or custom of the City of Detroit concerning fireworks crowd control. The "policy or custom" only becomes relevant *after* a constitutional duty has been imposed. In each of the cases cited by Plaintiffs, there was also a finding of state action or of state custody or control. In *Ward,* the plaintiff was killed by three police officers. In *Canton,* the plaintiff was a pretrial detainee at the time of her injuries. 489 U.S. at 381, 109 S.Ct. at 1200; In *Horton,* the court found that the plaintiff was in state custody by virtue of being subjected to custodial interrogation by one who had been delegated a traditional police function. 889 F.2d at 458. Lastly, in *Stoneking,* although the court stated that liability of municipal policymakers for policies or customs chosen or recklessly maintained is not dependent upon a "special relationship" between the officials and the individuals harmed, the actor in that case was a state employee. 882 F.2d at 724. Plaintiffs must first establish an affirmative obligation of care and protection. The "policy or custom" does not create the right; but only goes to proving that the state action or inaction when it has an affirmative obligation of care and protection, was grossly negligent or deliberately indifferent to the plaintiffs' constitutional rights.

D. *Statutory Entitlement*

[redacted] As a separate basis for liability under § 1983 Plaintiffs contend that the Michigan statutes created a liberty interest to provide protection to individuals at fireworks displays. Plaintiffs rely on Mich. Comp.Laws Ann. § 750.243b, which require a permit and imposes certain safety precautions;[7] and Mich.Comp.Laws Ann. § 752.-543, which makes it unlawful for a person to assemble or act in concert with 4 or more persons "for the purpose of engaging in conduct constituting the crime of riot...."[8]

7. Mich.Comp.Laws Ann. § 750.243b provides that the council or commission of a city may grant a permit for the use of fireworks provided that the entity "rule[s] on the competency and qualifications of [the] operator of pyrotechnic displays, ... and on the time, place, and safety aspects of the displays," *id.* at 750.243b(5); and requires the sponsors of the fireworks to "furnish proof of financial responsibility by a bond or insurance in an amount deemed necessary by the local governing authority "for protection of the public." *Id.* at 750.243b(3). Violations of this statute are treated as misdemeanors. *Id.* at 750.243e.

8. Mich.Comp.Laws Ann. § 752.543 states as follows:

> It is unlawful and constitutes an unlawful assembly for a person to assemble or act in concert with 4 or more persons for the purpose of engaging in conduct constituting the crime of riot, or to be present at an assembly that either has or develops such a purpose and to remain thereat with intent to advance such purpose.

Under Mich.Comp.Laws Ann. § 752.544(2) makes a violation of this section a felony, pun-

In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that property interests created by state law are entitled to procedural due process protection, provided the individual invoking the right has a "legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. *DeShaney* also left open the possibility that state law may create an "entitlement" to receive protective services pursuant to a state law. 489 U.S. at 195 n. 2, 109 S.Ct. at 1003 n. 2 The notion of an "entitlement" in the context of a general government service has been explained as follows:

> [I]f one wishes to claim a right to a general governmental service, he must show that the provider of the service has a duty to provide that service ... The party claiming the right must further show that the duty is owed to him as an individual rather than to the public at large. Of course, there could be some service which is owed to each and every individual in a political unit and hence could be considered a property interest. Nevertheless, in order to become property the service must be owed to discrete individuals or individual entities.... [I]t has been held that laws providing the *general public* with police or fire protection do not grant *individuals* a property right in that protection. All of these cases involved claims of entitlement to the provision of governmental services. Moreover, in all cases the defendants had a duty to provide the services.... The duty [though,] was to the undifferentiated *general public.* Thus, ... in order to establish the existence of a property interest in [a general government service,] the plaintiffs must point to (1) an independent source of authority (2) that establishes an absolute duty (3) that is owed to them as individuals rather than as members of the undifferentiated public.

*Westbrook v. City of Jackson,* 772 F.Supp. 932, 939–40 (S.D.Miss.1991) (*quoting Wooters v. Jornlin,* 477 F.Supp. 1140, 1144 (D.Del.1979), *aff'd,* 622 F.2d 580 (3d Cir.),

*cert. denied,* 449 U.S. 992, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980)) (citations omitted). *See also Shortino v. Wheeler,* 531 F.2d 938 (8th Cir.1976) (rejecting argument that "once a municipality undertakes to provide fire protection, 'it is under a constitutional obligation to provide adequate service' "); *Siddle v. City of Cambridge,* 761 F.Supp. 503 (S.D.Ohio 1991) (under Ohio law, government agent's duty is a duty to the public and a failure to perform it is generally a public and not an individual injury); *Coffman v. Wilson Police Dept.,* 739 F.Supp. 257 (E.D.Pa.1990) (in general, individual injured by another who breaks the law has no cause of action against police department since municipality's duty to protect is owed to citizenry as a whole rather than to any individual); *Hynson v. City of Chester,* 731 F.Supp. 1236 (E.D.Pa. 1990); *Reiff v. City of Philadelphia,* 471 F.Supp. 1262 (E.D.Pa.1979).

The duties imposed by the Michigan statutes are duties imposed to the general undifferentiated public. The fireworks statute on its face states that it is designed "for protection of the public." Furthermore, the rioting statute is a criminal statute, designed to protect the public at large. It is for this reason that Plaintiff's reliance on *Meador* 902 F.2d at 477 (holding that Kentucky statutes gave foster children entitlement to protective services); and *Siddle,* 761 F.Supp. 503 (protective order issued to prevent relative from abusing other family member creates property right) is inapposite. Plaintiffs have failed to state a claim on this basis.

### III. STATE CLAIMS

■ The second and third counts of Plaintiffs' First Amended Complaint raise state causes of action for public nuisance and premises liability under Michigan law. Federal courts have discretion to decide pendent state law claims if the federal and state claims arise out of a common nucleus of operative fact. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Thus, "[i]f the federal claims are dismissed before trial ... the

---

ishable by not more than 5 years in prison or a fine of not more than $5,000, or both.

state claim[s] should be dismissed as well." *Webb v. McCullough,* 828 F.2d 1151, 1160 (6th Cir.1987) (*quoting Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139)). Because the Court concludes that Plaintiffs have failed to state a claim under § 1983, the court dismisses the state law claims without prejudice so that Plaintiffs may pursue their remedies in the appropriate state forum. *See Reeves,* 754 F.Supp. at 1142.

## IV. OBSTRUCTION OF JUSTICE CLAIM UNDER 42 U.S.C. § 1985

■ Plaintiffs also argue that following the filing of Plaintiffs' original Complaint and during the pendency of criminal proceedings filed against Plaintiffs' assailants, Young, Knox, the City and Rutherford acted together and upon agreement to interfere with the criminal and civil proceedings. These actions allegedly include interfering with police investigation, obtaining false testimony, attempting to affect public and potential juror opinion and attempting to intimidate the plaintiffs. Plaintiffs maintain that this behavior states a violation of 42 U.S.C. § 1985(2).

Section 1985(2) consists of two parts. The first part relates to conspiracies to interfere with the administration of justice in federal courts; [9] the second half proscribes conspiracies to obstruct the course of justice in state courts.[10] *Dooley v. Reiss,* 736 F.2d 1392, 1395 (9th Cir.), *cert. denied* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984). Because the Court is dismissing this action before trial on purely legal grounds, no relief is available under the first clause. *Rutledge v. Arizona Bd.*

*of Regents,* 859 F.2d 732, 733 (9th Cir. 1988).

Under the second clause of Section 1985(2), a plaintiff must plead and prove that the conspirators' actions were motivated by an intent to deprive the plaintiff of "the equal protection of the laws." This requires "an allegation of a class-based, invidiously discriminatory animus." *Phillips v. Int'l Ass'n. of Bridge, Structural and Ornamental Iron Workers,* 556 F.2d 939, 941 (9th Cir.1877) (citation omitted). Plaintiffs have failed to make any allegations that Defendants somehow conspired to deprive them of equal protection of the laws by acting with discriminatory intent. Further, although Plaintiff Was was a witness in the state criminal proceeding which arose out of this incident, neither she nor any other Plaintiff was a party to that action. While Plaintiff Was may have hoped for an emotional vindication as a result of the criminal trial, she was not the defendant, and she had no legal stake in the outcome. Since the second part of 42 U.S.C. § 1985(2) requires a showing of "intent to deny any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws," and since Plaintiff's civil rights were not the subject of the state proceeding, Plaintiff does not have a jurisdictional predicate for a claim under the second part of 42 U.S.C. § 1985(2). The Court will therefore dismiss this aspect of Plaintiffs' claim without prejudice.

**9.** The first part of 42 U.S.C. § 1985(2) provides:

(2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully asserted to by him, or of his being or

having been such juror ... [an action for damages will lie].

**10.** The second part of 42 U.S.C. § 1985(2) provides:

[O]r if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; [an action for damages will lie].

## V. CONCLUSION

Accordingly, for all the foregoing reasons, Count I of Plaintiffs' complaint is dismissed with prejudice as to both Defendants. Since the Court finds that Plaintiffs have failed to state a claim under § 1983, it need not determine the separate defenses concerning that claim presented by Defendant Dayton Hudson or Defendants Young and Knox. Further, the Court hereby dismisses Plaintiffs' state law claims without prejudice as to the City of Detroit and Defendant Dayton–Hudson Corporation. Finally, Plaintiffs' § 1985(2) claim under the first clause relating to federal proceedings is dismissed with prejudice; and dismissed without prejudice as to the second clause relating to "the equal protection of the laws" in state actions.

SO ORDERED.